[No. S106440. July 14, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
KENNETH RAY NEAL, Defendant and Appellant.

**COUNSEL**

Victor J. Morse, under appointment by the Supreme Court, for Defendant and Appellant.

John T. Philipsborn and Charles D. Weisselberg for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Louis Vasquez, Janet Neeley, Robert P. Whitlock and Lloyd G. Carter, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, C. J.**—It long has been settled under the due process clause of the Fourteenth Amendment to the United States Constitution that an involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion is inadmissible in a criminal proceeding. (See, e.g., *Brown v. Mississippi* (1936) 297 U.S. 278, 285–286 [80 L.Ed. 682, 56 S.Ct. 461].) In *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*), recognizing that any statement obtained by an officer from a suspect during custodial interrogation may be potentially involuntary because such questioning may be coercive, the United States Supreme Court held that such a statement may be admitted in evidence only if the officer advises the suspect of both his or her right to remain silent and the right to have counsel present at questioning, and the suspect waives those rights and agrees to speak to the officer. The court further held in *Miranda* that if the suspect indicates that he or she does not wish to speak to the officer or wants to have counsel present at questioning, the officer must end the interrogation. In *Edwards v. Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880] (*Edwards*), the high court held that if the suspect invokes the right to counsel, the officer may not resume questioning on another occasion until counsel is present, unless the suspect voluntarily initiates further contact. In *Harris v. New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643] (*Harris*), the court held that although a statement obtained in violation of *Miranda* may not be introduced by the prosecution in its case-in-chief, *Miranda* was not intended to grant the suspect license to lie in his or her testimony at trial, and thus if an ensuing statement obtained in violation of *Miranda* is voluntary, the statement nonetheless may be admitted to impeach a defendant who testifies differently at trial.

In *People v. Peevy* (1998) 17 Cal.4th 1184 [73 Cal.Rptr.2d 865, 953 P.2d 1212], we addressed the issue whether a law enforcement officer's intentional continuation of interrogation of a defendant, in spite of the defendant's invocation of his or her right to counsel—in deliberate violation of *Miranda*—renders the statement obtained by the officer inadmissible, even for impeachment purposes. We concluded that in light of the emphasis in *Harris* that *Miranda* should not be interpreted to permit a defendant to testify falsely at trial with impunity, under *Harris* the officer's misconduct in *Peevy* did not affect the admissibility of the statement as impeachment evidence. (*Id.* at pp. 1193–1194, 1203–1205.)

In the present case, we address an issue related to the question before us in *Peevy* but nonetheless distinct. Here, a law enforcement officer, in his initial custodial interrogation of defendant, intentionally continued interrogation of defendant in deliberate violation of *Miranda* in spite of defendant's repeated invocation of both his right to remain silent and right to counsel—indeed, as we shall see, defendant *nine times* requested to speak with an attorney. Furthermore, the officer here not only continued the questioning improperly but badgered defendant, accusing him of lying, and informing defendant that "this is your one chance" to help himself and that "if you don't try and cooperate . . . , the system is going to stick it to you as hard as they can." Despite this badgering, defendant did not admit his guilt at that session. After the session ended, however, defendant was placed in custody and kept in jail overnight without access to counsel or other noncustodial personnel and without food or drink or toilet facilities. The following morning, defendant asked to speak to the officer, who thereafter met with him, resumed questioning, and ultimately obtained two confessions from him.

Prior to trial, the trial court granted a motion by defendant to suppress the portion of his initial exculpatory statement obtained in violation of *Miranda* (except for impeachment purposes), but denied his motion to suppress his two subsequent confessions. At defendant's trial on a charge of murder, the People introduced defendant's two confessions as part of their case-in-chief but did not introduce any portion of his initial exculpatory statement for any purpose. The issue presented here—which the People themselves characterize as a "close question"—is whether defendant acted voluntarily in initiating further contact with the officer on the day following the initial interrogation session, and whether defendant acted voluntarily in making the confessions that followed shortly thereafter.

As we shall explain, we conclude that in light of all the surrounding circumstances—including the officer's deliberate violation of *Miranda*; defendant's youth, inexperience, minimal education, and low intelligence; the deprivation and isolation imposed on defendant during his confinement; and a promise and a threat made by the officer—defendant's initiation of further contact with the officer was involuntary, and his two subsequent confessions were involuntary as well. As a result, we conclude not only that those confessions were inadmissible in the People's case-in-chief because they were obtained in violation of *Edwards*, but also that they were inadmissible for any purpose because they were involuntary. The consequence of the officer's misconduct—the absolute inability to introduce the confessions at trial—is severe, but is intended to deter other officers from engaging in misconduct of this sort in the future.

We therefore shall reverse the judgment of the Court of Appeal, which concluded that the trial court did not err by denying defendant's motion to

suppress his two confessions, and that in any event any error would have been harmless beyond a reasonable doubt. In finding no error, the Court of Appeal did not adequately take into account the circumstances establishing involuntariness, especially the officer's deliberate violation of *Miranda*. Further, we conclude that the Court of Appeal could not have properly concluded that the admission of the confessions was harmless beyond a reasonable doubt. Lastly, we note that at any retrial the confessions will be inadmissible for any purpose, because they were involuntary.[1]

## I

Defendant Kenneth Ray Neal was charged with the murder of Donald Collins and pleaded not guilty (Pen. Code, § 187, subd. (a)). Following trial, a jury returned a verdict finding defendant guilty of second degree murder. The trial court rendered judgment in accordance with the verdict, imposing a term of imprisonment of 15 years to life.

## A

Viewed in the light most favorable to the ensuing judgment, the evidence presented by the People at defendant's trial, including two confessions that defendant made to Detective Mario Martin of the Tulare County Sheriff's Office, reveals the following facts.

On April 3, 1999, the murder victim, Donald Collins, 69 years of age, six feet three inches in height, and 240 pounds in weight, resided in a small studio apartment at Sequoia Dawn, an apartment complex for retired persons located in Springville in Tulare County. Living with him was defendant, who was 18 years of age, five feet 10 inches tall, and approximately 143 pounds. Collins had met and befriended defendant some years earlier, when Collins was a child care worker and defendant a resident at Pioneer Home, a group home for boys located in Porterville in Tulare County. Collins often would refer to defendant as his grandson; defendant, however, usually would not refer to Collins as his grandfather. Some weeks before April 3, Collins had wired money to defendant, who then was in Oklahoma, to enable him to

---

[1] In *Chavez v. Martinez* (2003) 538 U.S. 760 [155 L.Ed.2d 984, 123 S.Ct. 1994], the United States Supreme Court recently addressed the question whether, for purposes of an action for damages under section 1983 of title 42 of the United States Code, a law enforcement officer violates a criminal suspect's Fifth Amendment privilege against compelled self-incrimination and his Fourteenth Amendment substantive due process right to be free from coercive interrogation, if the suspect never is charged with or tried for a crime and hence never is confronted with statements taken from him as evidence. As a section 1983 action for damages, *Chavez* has no bearing on this case, which is a criminal proceeding in which defendant challenges the admissibility of his two confessions.

return to Tulare County by bus. Collins gave defendant keys to his apartment and also to his automobile.

On the evening of April 3, after Collins set two cheeseburgers to cook on an electric griddle and turned on an exhaust fan, he settled into an easy chair in front of a television. As Collins was seated, defendant strangled him from behind by tightening an electrical cord around his neck, deliberately and with substantial force, for a considerable period of time—perhaps from three to seven minutes. Defendant had taken the electrical cord from the electric griddle, and had cut off its ends with a kitchen knife. Collins may have consumed some wine during the afternoon, but apparently was unimpaired. Defendant consumed some vodka around the same time, but did not become intoxicated. The triggering cause of defendant's attack was an argument he had with Collins some 30 minutes earlier, concerning which television programs to watch. The underlying cause was somewhat deeper: Collins was homosexual but long had been simply a good friend of defendant's, never having made any sexual advances toward him. But on two occasions within a week of the killing, as defendant was sleeping, Collins had made unwelcome advances, attempting to touch defendant's penis.

After the killing, defendant wiped surfaces throughout the apartment to eliminate his fingerprints. In addition, defendant wrote the following note, which he left on a dining room table: "Dad Im Sorry I did not mean it realy Your foster son Jon Adkins. [¶] 3/4/99 morning Bitch ass [¶] J.A." Adkins was another young man whom Collins had met and befriended at a group home, apparently while Adkins was a resident and Collins a child care worker. For about a year and a half prior to defendant's moving in with Collins, Adkins had lived with Collins in what seems to have been a stormy relationship, under circumstances establishing that Adkins was a liar and a thief. Adkins had been extremely jealous of defendant, and had moved out of Collins's apartment not long before defendant moved in. The note bore a fingerprint left by someone other than defendant. At trial, however, a questioned-documents expert opined that the note in fact was written by defendant. Defendant fled from Collins's apartment in Collins's automobile.

Early in the morning of April 4, driving Collins's automobile, defendant showed up at the apartment of Ross Lambert. Lambert was an 83-year-old man who consumed a half-gallon of vodka every two days, and had done so for nine or 10 years. He was one of Collins's friends and, through Collins, one of defendant's friends as well. On defendant's initiative, Lambert and defendant telephoned Collins's residence several times, but received no answer. Defendant and Lambert then drove there in Collins's car to check on his condition. Once there, defendant opened the door with his key and ushered Lambert in. Lambert and defendant soon found Collins's dead body

in the easy chair. Neither Collins's body nor his apartment revealed any sign of a struggle. Nothing was disturbed or missing. There was no indication of a forced entry or a hurried exit. The two cheeseburgers were still on the electric griddle, and the exhaust fan was still on. The note purportedly written by Adkins was on the dining room table.

In his own defense, defendant introduced, in its entirety, an initial exculpatory statement that he made to Detective Martin before making his two confessions. Defendant also testified concerning his friendship with Collins over the years. Defendant's testimony—which largely was corroborated by other witnesses on these points—described the circumstances of his meeting Collins at Pioneer Home in Porterville, and the special treatment he subsequently received from Collins, including "buy[ing] us alcohol and drugs and . . . tak[ing] us places we weren't supposed to go," "like to girlfriends' house," "help[ing] me break out of the group home," and "hid[ing] me from the cops" afterward. Defendant gave the following testimony—which was inconsistent with the substance of his two confessions to Detective Martin— concerning the circumstances of Collins's death: On the day in question, defendant consumed three or four drinks of vodka at Lambert's apartment in Collins's presence, each drink filling a shot glass, became "drunk," and was "buzzing pretty good." Once back at Collins's apartment, defendant lay down on Collins's bed fully clothed, Collins began to cook himself dinner, and defendant soon fell asleep on his stomach. Defendant awoke with a start to find Collins lying on top of him, pulling at his pants in an attempt to forcibly sodomize him. Defendant and Collins struggled violently on the bed. Defendant finally broke free and "cussed" at Collins, and Collins apologized. Collins then sat down in his easy chair, and defendant sat down on a small sofa nearby. Within two or three minutes, still angry at the attack and remembering Collins's two recent unwelcome attempts to touch his penis, defendant strangled Collins, taking only two or three minutes to do so. In an attempt to explain the inconsistency between his testimony and his confessions to Martin, defendant stated or implied as to each confession, "I was just telling [Martin] anything he wanted to hear so he'd . . . leave me alone." Defendant also asserted he did not tell Martin about Collins's attempt to forcibly sodomize him, even though he told him about Collins's two recent attempts to touch his penis, for fear of being thought homosexual. On cross-examination, defendant admitted that on the day after Collins was killed, the bed in Collins's apartment, which defendant admitted he had left as it was, was found undisturbed, as though no one had lain upon it.

### B

Prior to trial, defendant moved to suppress evidence, including the initial exculpatory statement and the two subsequent confessions that he made to

Detective Martin. Among other things, defendant claimed that the exculpatory statement and the confessions were obtained in violation of *Miranda* because they were not preceded by adequate advisement or valid waiver of his right to remain silent or his right to counsel. Defendant also claimed that the exculpatory statement and the confessions were involuntary.[2] In response, the People took the position that, at trial, they would seek to introduce the confessions but not the initial exculpatory statement.

The ensuing evidentiary hearing was devoted to the substance and circumstances of defendant's initial exculpatory statement and his two subsequent confessions.

Defendant's initial exculpatory statement, which was recorded on audiotape and subsequently transcribed, arose from an interview conducted by Detective Martin on April 4, the day after Collins's death, between 5:11 p.m. and 6:17 p.m., in what formerly was the briefing room at the sheriff's substation in Porterville.

At the hearing, Detective Martin testified as follows: Prior to the first interview, he met defendant and Lambert outside Collins's apartment following the report of Collins's death, and dealt with both individuals simply as witnesses. Martin was told by defendant that he had attended continuation high school and had failed to graduate. At Martin's request, defendant wrote out a summary of what defendant knew about Collins's death, while Martin interviewed Lambert. Once he finished interviewing Lambert, Martin asked defendant whether he would accompany him to the Porterville substation for an interview, and defendant agreed. At the substation, Martin asked defendant to write out a summary of his activities during the preceding 24 hours, and defendant again complied.

As the first interview opened, with both Detective Martin and defendant speaking in a relatively conversational tone, defendant provided background information about himself, about his first meeting with Collins and their ensuing friendship, and about Adkins, whom he described as a 32-year-old man who once was Collins's foster son, had stolen a large sum of money from Collins, and now lived somewhere in Fresno. Defendant named Adkins as the only person he could think of who might have killed Collins, and denied having seen the note found on Collins's dining room table, purportedly written by Adkins. Defendant went on to state that on April 3, the day of

---

[2] Defendant had made a substantially identical motion to suppress his initial exculpatory statement and his two subsequent confessions in the course of the preliminary hearing that led to the filing of the underlying information, but without success. He also had raised substantially identical claims in moving to set aside the information pursuant to Penal Code section 995 on the ground of the absence of reasonable or probable cause, also without success.

the killing, he had spent time with a young woman named Sara and then, about 2:30 p.m., went to Lambert's apartment, where he stayed the night and (apparently) had a small "drink of [v]odka," "just . . . like taking a drink out of a Pepsi." When Martin asked defendant about the source of some evidently fresh marks he noticed on defendant's hands, defendant replied, now adopting a defensive tone, that he did not know the source of the marks and that they probably were two or three days old. Stating to defendant that the marks looked fresher than he claimed, Martin interrupted the interview at 5:32 p.m. to leave the room.

When Detective Martin reentered the room at 5:45 p.m., the interview resumed. In what followed, Martin remained even in tone, but defendant became animated and self-protective. Defendant stated immediately: "I'm ready to go right now." Martin, however, did not allow defendant to depart, but instead advised him of his *Miranda* rights. In the face of defendant's reluctance to waive his rights, Martin pressed on with questioning about the marks on defendant's hands, which defendant now asserted arose from a fight he had had in Porterville with "some dude" whom he again and again refused to identify, even at the risk of "fac[ing] murder charges." Martin made plain he believed that defendant was lying, and suspected that defendant had killed Collins. Defendant repeatedly denied being a liar or a killer. Defendant soon invoked his right to counsel—"I am ready to talk to my lawyer"—as well as his right to remain silent—"I am not saying nothing now." Martin continued with the interrogation. Defendant continued to invoke his right to counsel repeatedly, for a total of nine times in all. Martin pressed on.

Detective Martin subsequently placed defendant under arrest for the murder of Collins. Martin inquired whether defendant's relationship with Collins was sexual, and defendant asserted it was not. Martin then made a promise and a threat to defendant: "I mean this is your one chance. I am the bus driver in [a] Greyhound bus and you are the passenger back there. I mean this—make believe that I am driving the bus and you want to get off the bus. It's going to be up to the bus driver, me, you know to let you off that bus. You know closer to home or I can take you all the way to Timbuktu. Now I am the one you need to tell hey I want to get off this bus." If you "try and cooperate," "I can make it as best as I can for you. But believe me, if you don't try and cooperate . . . , the system is going to stick it to you as hard as they can . . . , they are going to just hit you as hard as they can," that is, "[c]harge you with a heavier [sic] charge as they can, you know first degree murder or whatever." Martin then played upon defendant's friendship with Collins and his sense of guilt, eliciting that defendant considered Collins his "closest friend," his "best friend," and even his "grandpa," and that he "cared" for Collins "[q]uite a bit." Martin soon terminated the interview.

Detective Martin admitted that he intentionally continued interrogation in deliberate violation of *Miranda* in spite of defendant's invocation of both his right to remain silent and right to counsel—the latter invoked, according to Martin's own count, "probably" "7 to 10 times"—in order to obtain a statement that the People might use "[f]or possible further impeachment at trial . . . if [defendant] decided to testify." In doing so, Martin conceded that he was applying what he called a "useful tool" that he had learned from a supervisor and knew to be improper. Martin also conceded that he terminated the interview only because he grew tired of listening to defendant deny killing Collins.

At the hearing, Detective Martin testified that at or shortly after the time defendant was booked into jail, defendant volunteered, "You're not a rat if you tell on yourself," and "A lot of people confess, don't they?"; and Martin responded, "[I]f you know anything about this, the best thing is for you to tell me." Defendant then replied to Martin that he "would sleep on it and maybe get back in touch" with Martin, and finally was placed in a cell. Defendant testified at the hearing that he was not given food or drink, that he did not have a toilet or a sink in his cell, and that he was not taken to a bathroom or provided with any water until the next morning. Defendant did not have access to counsel nor, evidently, to any other noncustodial personnel.

Defendant's first confession, which also was recorded on audiotape and subsequently transcribed, arose from an interview by Detective Martin conducted the following day, April 5, between 12:05 p.m. and 12:29 p.m. at the Porterville substation.

As this interview began, defendant acknowledged he had sent word to Detective Martin through a female detective named Tolson, evidently about 10:25 a.m., requesting that Martin return because defendant wished to speak to him about Collins's death. (Tolson was present at the interview, but did not participate except for one or two questions or comments.) After Martin again advised him of his *Miranda* rights, defendant said he would speak with him. Martin and defendant recounted "the only promises" that Martin had made to defendant: Martin stated he would "send a letter to your mom"; Martin also stated he would allow "you . . . to smoke a couple cigarettes"; and when defendant stated, "you gotta tell them that I helped you out, so that they help me out when I go to court," Martin responded, "[t]hat's no problem" and "that's on tape." Defendant testified at the hearing that he sent word to Martin " 'cause I felt like he'd be able to help me" and that when defendant did so, he was "feel[ing] guilty" and guilt "was weighing pretty heavy on [his] mind."

As this interview continued, defendant confessed to the murder of Collins. Asked by Martin for a reason, defendant answered: "I don't know, 'cause like

me and him just, a lot of time we just be sitting there talking or something like that. And, and if I said something [he] didn't agree with, he'd raise his voice to me. He did that shit a lot of time. And then finally I just got fed up with it. And I just killed him. And but at first I, more or less what I was doing, I was trying to just like intimidate him and scare him, but I guess it went a little too far and I didn't know what I did until I was done." Defendant provided additional details: "Yeah, we were sitting there watching t.v., and at first I was flipping through channel [sic]. And, and he said he wanted to watch the news. And I said, well I wanted to watch MTV, I wanta watch the videos. And then he's all, well God damn it, it's my fuckin' house, and this and that. And, and then I just said, just fuck it. And just, hold my breath, and then just sit there for about thirty minutes, looking at the t.v., but not really looking at it, just thinking. And, and that's what I went and did." Defendant further stated that, throughout the incident, "I wasn't thinking at all," but also that, as he strangled Collins for what he estimated was between three and seven minutes, he was thinking about what he was doing, and decided to follow through in order to avoid going to prison. Defendant said that he had had "two or three drinks of vodka," perhaps two or three hours earlier: "I wasn't drunk or nothing, but I was buzzin' and I wasn't fuckin' realize what I did"; "I just fuckin' snapped and just fuckin' something spur-of-the-moment." Defendant added that after writing the note that he signed with Adkins's name and wiping surfaces throughout the apartment to eliminate his finger-prints, he fled, remained awake all night thinking about what he had done, and then proceeded to Lambert's apartment in the morning.

As this second interview progressed, defendant admitted he had lied throughout the first interview, and also explained why he had done so: "I just couldn't confess then, but, but now I just . . . [b]een thinking all night. And even when I was in that room for most of the day . . . [s]till thinking about it." Defendant stated: "I do feel a little better since I got it out," and "I do regret doing it."

As the second interview came to a close, Detective Martin asked, "[Collins's] death was not caused because of any sexual thing?" Defendant answered, "No, it wasn't." Apparently acknowledging the existence of rumors that Collins was homosexual, defendant added: "He ain't got done anything to me, 'cause if he would have done something to me, I would have whooped his ass. I wouldn't have killed him for it, but I would have whooped his ass."

Defendant's second confession, which was recorded on videotape as well as audiotape, and subsequently was transcribed, arose from a third interview conducted by Detective Martin at his office north of Visalia later that same day, April 5, between 4:45 p.m. and 5:16 p.m.

At the outset of this interview, which Detective Martin arranged in order to clarify some points, Martin reminded defendant of the advisement of defendant's *Miranda* rights given at the second interview, and defendant stated he would continue to speak with him. Detective Tolson was not present.

In the course of the third interview, defendant again confessed to killing Collins, adding details to what he had revealed in the second interview. Some details were relatively minor, including the fact that the two or three drinks of vodka he had consumed before killing Collins were each the quantity of a shot glass, and that Collins perhaps had consumed some wine around the time that defendant had the vodka. Other details, however, were more significant. These related to the events that defendant said had caused him to "explode[]" and to kill Collins—events he said he had not related in the second interview, apparently because he would have been embarrassed to do so, perhaps especially in the presence of Detective Tolson, who was a woman. Defendant stated as follows: Collins indeed was homosexual, but had been "a real good friend for the longest time" and never had made any sexual advances. But about a week before the killing, as defendant was sleeping, Collins had tried to touch defendant's penis. Defendant awoke, became angry, slapped Collins's hand away, told him, "[Y]ou're lucky I don't slap the hell out of you," and added, "don't be touching me," to which Collins responded, "alright." Collins's response notwithstanding, a night or two before the killing a similar incident occurred. Defendant lost respect for Collins but did not leave his apartment, because he had nowhere else to go. Defendant added that before committing the crime, he cut the ends off the electrical cord that he had used to strangle Collins, and threw them away afterward in order to avoid leaving fingerprints. Defendant also admitted writing the note purportedly signed by Adkins, in order to shift suspicion from himself. Defendant then stated that the reason he did not flee from Porterville was that he was "feeling guilty" and "was sorta hoping that you guys would catch on in a way."

As the third interview came to a close, Detective Martin asked, "So what finally convinced you to . . . come out with the truth[?]"; and defendant answered, "The guilt and . . . . I was thinking I wanted to see my mom and brother again one of these days."

At the hearing, defendant testified that it was only after the third interview that he was provided with food—for the first time after more than 24 hours in custody, and more than 36 hours since his last meal.

Following the hearing, the trial court granted defendant's motion to suppress, except for impeachment purposes, the portion of his initial exculpatory statement to Detective Martin that was obtained in violation of *Miranda*. The trial court determined, among other things, that the latter portion of that

initial statement was inadmissible under *Miranda* save for impeachment purposes, because Martin intentionally continued interrogation in deliberate violation of *Miranda*—in "blatant disregard" of *Miranda*, to quote the trial court's words—in spite of defendant's invocation of both his right to remain silent and right to counsel.[3] By contrast, the trial court denied defendant's motion to suppress his two confessions. The trial court determined at the threshold that defendant initiated the second interview voluntarily, and then determined that defendant adequately was advised of his *Miranda* rights, validly waived them at the second and third interviews, and made his resulting confessions voluntarily.

At trial, over defendant's continued objections, the People introduced defendant's two confessions. Although the People did not introduce for any purpose any portion of defendant's initial exculpatory statement, defendant, as noted, subsequently introduced that statement in its entirety as part of his defense.

As stated above, after considering the evidence the jury returned a verdict finding defendant guilty of second degree murder, and the trial court rendered judgment in conformity with the verdict.

### C

On appeal, the Court of Appeal affirmed. The appellate court concluded that the trial court did not err by denying defendant's motion to suppress his two confessions. On a point pertinent here, the Court of Appeal agreed with the trial court's threshold determination that defendant initiated the second interview voluntarily, reasoning that "[t]his interview occurred many hours after Detective Martin committed the *Miranda* violation," and "[t]he only 'inducements' . . . were several cigarettes, a letter or telephone call to [defendant's] mother, and Martin's promise to inform the court that [defendant] had confessed." The Court of Appeal further concluded that, even if the trial court had erred, any such error would have been harmless beyond a reasonable doubt because, in its words, the "direct and circumstantial evidence of [defendant's] guilt was strong."

We granted defendant's petition for review. We conclude that we must reverse the judgment of the Court of Appeal.

---

[3] After denying, at the preliminary hearing, defendant's substantially identical motion to suppress his initial exculpatory statement and his two subsequent confessions, the magistrate stated that Detective Martin's deliberate violation of *Miranda* came "very close to coercion." In denying a motion to set aside the information, in which defendant raised substantially identical claims, the trial court indicated it "share[d] the magistrate's concern" about Martin's misconduct.

## II

In *People v. Peevy, supra,* 17 Cal.4th 1184, we addressed an issue arising from a law enforcement officer's intentional continuation of interrogation of a defendant in deliberate violation of *Miranda, supra,* 384 U.S. 436, for purposes of impeachment, in spite of the defendant's invocation of his right to counsel. We concluded that the officer's misconduct did not render *Harris, supra,* 401 U.S. 222, inapplicable, and that the statement obtained from the defendant remained admissible for impeachment purposes because it was voluntary.

In the present case, we address an issue related to the question in *Peevy* but nonetheless distinct. Here, at the first interview, Detective Martin intentionally continued interrogating defendant in deliberate violation of *Miranda,* in order to be able to impeach him, in spite of defendant's invocation of both his right to remain silent and right to counsel—the request for counsel having been repeated by defendant nine times—but Martin obtained only an exculpatory statement. The following day, after defendant initiated further contact, Martin elicited defendant's two confessions.

As we shall explain, we conclude that in light of all the surrounding circumstances—including Detective Martin's deliberate violation of *Miranda;* the circumstance that defendant remained in custody without being provided access to counsel before requesting to speak to Martin; defendant's youth, inexperience, minimal education, and low intelligence; the deprivation and isolation imposed on defendant during his confinement; and the promise and the threat Martin made to defendant during the initial interrogation after questioning should have ceased—defendant's initiation of further contact with Martin, and his two subsequent confessions, were involuntary. As a result, we conclude that defendant's confessions were inadmissible in the People's case-in-chief because they were obtained in violation of *Edwards, supra,* 451 U.S. 477, but also that they were inadmissible for any purpose because they were involuntary.[4]

---

[4] In *Peevy,* we declined to address the question, which had not been properly raised, whether the People may use a voluntary statement to *impeach* a defendant if the statement was intentionally obtained by a law enforcement officer, in deliberate violation of *Miranda,* pursuant to a "widespread" or "systematic" "policy" or "training" or "practice" to obtain such statements for the purpose of impeachment. (*People v. Peevy, supra,* 17 Cal.4th at pp. 1205–1208.) We have no occasion to address that question here. Putting aside the issue whether Detective Martin's intentional continuation of interrogation in deliberate violation of *Miranda,* for the purpose of impeachment, may be said to have been in accordance with a widespread or systematic policy or training or practice because it was an application of what he called a "useful tool" that he had learned from a supervisor and knew to be improper, we note that the People did not use or even seek to use, for the purpose of impeachment or

A

■ It long has been held that the due process clause of the Fourteenth Amendment to the United States Constitution makes inadmissible any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion. (E.g., *Jackson v. Denno* (1964) 378 U.S. 368, 385–386 [12 L.Ed.2d 908, 84 S.Ct. 1774]; see, e.g., *Brown v. Mississippi, supra,* 297 U.S. at pp. 285–286; *People v. Weaver* (2001) 26 Cal.4th 876, 920 [111 Cal.Rptr.2d 2, 29 P.3d 103]; *People v. Benson* (1990) 52 Cal.3d 754, 778 [276 Cal.Rptr. 827, 802 P.2d 330]; see generally 2 LaFave et al., Criminal Procedure (2d ed. 1999) § 6.2, pp. 441–467.) A statement is involuntary (e.g., *Malloy v. Hogan* (1964) 378 U.S. 1, 7 [12 L.Ed.2d 653, 84 S.Ct. 1489]) when, among other circumstances, it "was ' "extracted by any sort of threats . . . , [or] obtained by any direct or implied promises, however slight . . . ." ' " (*Hutto v. Ross* (1976) 429 U.S. 28, 30 [50 L.Ed.2d 194, 97 S.Ct. 202] (by the court); accord, e.g., *Malloy v. Hogan, supra,* 378 U.S. at p. 7; *People v. Benson, supra,* 52 Cal.3d at p. 778.) ■ Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the "totality of [the] circumstances." (*Withrow v. Williams* (1993) 507 U.S. 680, 688–689 [123 L.Ed.2d 407, 113 S.Ct. 1745]; accord, e.g., *Haynes v. Washington* (1963) 373 U.S. 503, 514 [10 L.Ed.2d 513, 83 S.Ct. 1336]; *People v. Weaver, supra,* 26 Cal.4th at p. 920; *People v. Williams* (1997) 16 Cal.4th 635, 660 [66 Cal.Rptr.2d 573, 941 P.2d 752]; see generally 2 LaFave et al., Criminal Procedure, *supra,* § 6.2, pp. 441–467.)

In *Miranda, supra,* 384 U.S. 436, recognizing that any statement obtained from a criminal suspect by a law enforcement officer during custodial interrogation is potentially involuntary because such questioning may be coercive, the United States Supreme Court laid down its now familiar rule: "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination . . . . As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. *If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before*

otherwise, *any* portion of defendant's initial exculpatory statement at the first interview. We therefore leave resolution of that question to a case in which it has been properly raised.

*speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.* The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." (*Miranda, supra,* 384 U.S. at pp. 444–445, italics added.)

In *Edwards, supra,* 451 U.S. 477, the court announced a related rule designed to prevent the "badgering" of a criminal suspect by a law enforcement officer in order to get the suspect to waive his or her rights under *Miranda* (*Michigan v. Harvey* (1990) 494 U.S. 344, 350 [108 L.Ed.2d 293, 110 S.Ct. 1176]; accord, e.g., *Davis v. United States* (1994) 512 U.S. 452, 458 [129 L.Ed.2d 362, 114 S.Ct. 2350]): "[A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him" (*Edwards, supra,* 451 U.S. at pp. 484–485; accord, *Arizona v. Roberson* (1988) 486 U.S. 675, 677 [100 L.Ed.2d 704, 108 S.Ct. 2093]) and indeed not until counsel is actually present (*Minnick v. Mississippi* (1990) 498 U.S. 146, 153 [112 L.Ed.2d 489, 111 S.Ct. 486]), "unless the accused himself initiates further communication, exchanges, or conversations with the police" (*Edwards, supra,* 451 U.S. at p. 485; accord, e.g., *Minnick v. Mississippi, supra,* 498 U.S. at p. 150; *Arizona v. Roberson, supra,* 486 U.S. at p. 677).

In denying defendant's motion to suppress his two confessions, the trial court determined at the threshold that defendant voluntarily initiated the second interview preceding those confessions, and went on to determine that defendant then voluntarily made those confessions.

■ In reviewing the trial court's determinations of voluntariness, we apply an independent standard of review, doing so "in light of the record in its entirety, including 'all the surrounding circumstances—both the characteristics of the accused and the details of the [encounter]' . . . ." (*People v. Benson, supra,* 52 Cal.3d at p. 779, citation omitted; accord, e.g., *People v. Williams, supra,* 16 Cal.4th at pp. 659–660.)

Applying the independent standard of review, we conclude, for the reasons set forth hereafter, that defendant's initiation of the second interview preceding his two confessions was involuntary. We further conclude that, notwithstanding defendant's purported *Miranda* waivers, his confessions, which followed shortly thereafter, were involuntary as well.

We begin with the fact that in the course of the first interview, Detective Martin intentionally continued interrogation in deliberate violation of

*Miranda* in spite of defendant's invocation of both his right to remain silent and right to counsel. Martin conceded that, according to his own count, defendant invoked his right to counsel "probably" "7 to 10 times." Martin also conceded that in proceeding as he did, he was applying what he called a "useful tool" that he had learned from a supervisor and knew to be improper, in order to obtain a statement that the People might use "[f]or possible further impeachment at trial . . . if [defendant] decided to testify."[5] Martin acknowledged that he terminated the first interview only because he grew tired of listening to defendant deny killing Collins. As we have emphasized on more than one occasion, misconduct such as Martin's is "unethical" and must be "strongly disapproved." (*People v. Bradford* (1997) 14 Cal.4th 1005, 1042 [60 Cal.Rptr.2d 225, 929 P.2d 544]; see *People v. Storm* (2002) 28 Cal.4th 1007, 1034 [124 Cal.Rptr.2d 110, 52 P.3d 52]; *People v. Peevy, supra,* 17 Cal.4th at p. 1204.)

Prior to terminating the first interview, Detective Martin went beyond his deliberate violation of *Miranda* in order to make both a promise and a threat to defendant, each of which undermined the voluntariness of defendant's initiation of the second interview and his two subsequent confessions: "I mean this is your one chance. I am the bus driver in [a] Greyhound bus and you are the passenger back there. I mean this—make believe that I am driving the bus and you want to get off the bus. It's going to be up to the bus driver, me, you know to let you off that bus. You know closer to home or I can take you all the way to Timbuktu. Now I am the one you need to tell hey I want to get off this bus." If you "try and cooperate," "I can make it as best as I can for you. But believe me, if you don't try and cooperate . . . , the system is going to stick it to you as hard as they can . . . , they are going to just hit you as hard as they can," that is, "[c]harge you with a heavier [*sic*] charge as they can, you know first degree murder or whatever."

The next day, sending word to Detective Martin through Detective Tolson, defendant initiated the second interview. Defendant immediately made a confession. Not long thereafter, Martin initiated the third interview, and defendant immediately made another confession.

Under our review of the record in its entirety, the first circumstance that weighs most heavily against the voluntariness of defendant's initiation of the second interview, and against the voluntariness of his two subsequent

---

[5] Unfortunately, as the California Attorneys for Criminal Justice argue in their brief as amicus curiae supporting defendant, at least until recently the employment of interrogation techniques in deliberate violation of *Miranda* as a "useful" but improper "tool" has not been isolated or limited to Detective Martin and the Tulare County Sheriff's Office, and worse yet has not been without widespread official encouragement. (Quoting Weisselberg, *In the Stationhouse After Dickerson* (2001) 99 Mich. L.Rev. 1121, 1136–1138.)

confessions as well, is the fact that in the course of the first interview, Detective Martin intentionally continued interrogation in deliberate violation of *Miranda* in spite of defendant's repeated invocation of both his right to remain silent and right to counsel. Martin's message to defendant could not have been clearer: Martin would not honor defendant's right to silence or his right to counsel until defendant gave him a confession.

To speak of Detective Martin's misconduct during the first interview, as did the trial court, as "blatant disregard" of *Miranda* is to understate its blameworthiness, inasmuch as Martin purposefully disobeyed *Miranda*'s injunction: "If . . . [a criminal suspect] indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking [or continuing to speak] *there can be no questioning*. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated [or to continue to be interrogated], *the police may not question him*." (*Miranda, supra,* 384 U.S. at pp. 444–445, italics added.)

Invoking both his right to remain silent and his right to counsel in the first interview, defendant expressed a desire not to make any uncounselled statement to Detective Martin whatsoever but rather to terminate the interrogation altogether. Intentionally continuing to interrogate defendant in deliberate violation of *Miranda*, Martin manifested his determination to extract an uncounselled statement of some sort. For leverage, Martin "branded" defendant a "liar" (*People v. McClary* (1977) 20 Cal.3d 218, 229 [142 Cal.Rptr. 163, 571 P.2d 620], overruled on another point, *People v. Cahill* (1993) 5 Cal.4th 478, 509–510, fn. 17 [20 Cal.Rptr.2d 582, 853 P.2d 1037]) and used "deception" in implying that he possessed more incriminating evidence than he actually did (*People v. Hogan* (1982) 31 Cal.3d 815, 840 [183 Cal.Rptr. 817, 647 P.2d 93], disapproved on another point, *People v. Cooper* (1991) 53 Cal.3d 771, 836 [281 Cal.Rptr. 90, 809 P.2d 865]).

It is true that defendant did not confess to Detective Martin in the course of the first interview, but asked to speak to Martin the following day, although only after a night in custody without access to counsel or other noncustodial personnel and without food or drink or toilet facilities. Even though defendant at the first interview had expressed his desire not to give any uncounselled statement at all, Martin succeeded in obtaining from defendant two confessions, both of them uncounselled, following defendant's initiation of the second interview. From the fact of defendant's resistance, and Martin's overcoming of his resistance, we may infer that defendant received the message that Martin would not honor defendant's right to silence or right to counsel until defendant confessed.

The facts set out above are unlike those in our recent decision in *People v. Storm, supra,* 28 Cal.4th 1007. There, "[d]uring an investigation of his wife's

homicide, defendant agreed to take a polygraph test. At the police station, he received *Miranda* warnings and waived his rights, but then said he wished to consult a lawyer before speaking further. Rather than cease questioning immediately, as *Miranda* and . . . *Edwards* . . . require in a custodial setting, the polygraph operator encouraged defendant to keep talking. During this interlude, defendant admitted he killed his wife, claiming an assisted suicide. [¶] Defendant was allowed to leave the station. Two days later, detectives came to his home. After assuring him he would not then be arrested, they interviewed him again without new *Miranda* warnings. Defendant provided a more detailed version of his assisted-suicide story. The detectives then departed as they had promised." (*People v. Storm, supra,* 28 Cal.4th at p. 1012.) The defendant subsequently was charged with murder and, following a trial at which defendant's statements were admitted in evidence, he was convicted. On appeal, the defendant contended that the admission of these statements was error, but the Court of Appeal rejected this claim. We subsequently agreed with the Court of Appeal: "The narrow nature of our holding should be emphasized. We conclude only that *Edwards* is not violated when the police recontact a suspect after a break in custody *which gives the suspect reasonable time and opportunity, while free from coercive custodial pressures, to consult counsel if he or she wishes to do so.* We do not suggest the police can avoid *Edwards* simply by allowing the suspect to step outside the station house at midnight on a Saturday, then promptly rearresting him without affording any realistic opportunity to seek counsel's assistance free of the coercive atmosphere of custody. We are persuaded, however, that the two-day . . . hiatus at issue here . . . was amply sufficient to dissipate custodial pressures and permit defendant to consult counsel." (*People v. Storm, supra,* 28 Cal.4th at pp. 1024–1025.)

On all points, the facts here are distinguishable from those in *Storm.* When Detective Martin finally terminated the first interview after intentionally continuing the interrogation in deliberate violation of *Miranda,* notwithstanding defendant's invocation of both his right to remain silent and his right to counsel, he did not allow defendant to leave; Martin already had arrested defendant, and then caused him to be jailed. When Martin resumed interrogation the next day, defendant remained in custody, and Martin questioned him in a custodial setting. Before confessing, defendant was under arrest; and after confessing, he remained under arrest. Thus, although the defendant in *Storm* generally was questioned outside of the "coercive atmosphere of *police custody*" (*People v. Storm, supra,* 28 Cal.4th at p. 1013), defendant here undeniably was questioned in that very atmosphere, from beginning to end. The break in custody at the heart of *Storm* simply is absent in the case before us.

█ The second circumstance that also weighs heavily against the voluntariness of defendant's initiation of the second interview, and against the

voluntariness of his two subsequent confessions as well, involves defendant himself and his situation. Here, our evaluation "permits—indeed, it mandates—inquiry into all the circumstances," including "evaluation of [defendant's] age, experience, education, background, and intelligence . . . ." (*Fare v. Michael C.* (1979) 442 U.S. 707, 725 [61 L.Ed.2d 197, 99 S.Ct. 2560].) At the time pertinent here, defendant was 18 years of age. Defendant's experience apparently was hardly extensive, certainly so with respect to legal matters, suggesting no knowledge that he soon would be brought before a magistrate and have counsel appointed for him. Defendant's education was minimal, inasmuch as he failed to graduate even from continuation high school. Defendant's background was one of thoroughgoing neglect if not abuse. And defendant's intelligence, as the record reveals from beginning to end, was quite low. As for defendant's situation, after he was arrested and jailed following the first interview, he was placed in a cell without a toilet or a sink, he did not have access to counsel or to any other noncustodial personnel, he was not taken to a bathroom or given any water until the next morning, and he was not provided with any food until some time following the third interview, after more than 24 hours in custody and more than 36 hours since his last meal. Perhaps most significantly, defendant, as far as he could tell, was confined incommunicado. When defendant declared, "I am ready to talk to my lawyer," Detective Martin implied that defendant had to talk *to him*, and could talk to no one else. Martin did not offer defendant an opportunity to speak with an attorney or even with his mother or his brother, nor was there any evidence suggesting that anyone other than Martin made such an offer. Although defendant's situation might not have reflected "physical punishment" (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226 [36 L.Ed.2d 854, 93 S.Ct. 2041]) in the strictest sense of the phrase, its harshness cannot be ignored. Put simply, defendant's situation "could only have increased his feelings of helplessness." (*People v. Montano* (1991) 226 Cal.App.3d 914, 939 [277 Cal.Rptr. 327].)

■ The third circumstance that additionally weighs heavily against the voluntariness of defendant's initiation of the second interview, and against the voluntariness of his two subsequent confessions as well, arises from Detective Martin's promise and threat to defendant at the first interview. Promises and threats traditionally have been recognized as corrosive of voluntariness. (See, e.g., *Hutto v. Ross, supra*, 429 U.S. at p. 30; *Malloy v. Hogan, supra*, 378 U.S. at p. 7; *People v. Benson, supra*, 52 Cal.3d at p. 778.) Here we have both a promise and a threat. Each was made by Martin long after he should have brought the first interview to an end upon defendant's repeated invocation of both his right to remain silent and right to counsel. Specifically, Martin threatened defendant, in Martin's Greyhound bus metaphor, to drop

defendant off closer to Timbuktu than to home if he did not cooperate.[6] Martin also promised defendant, if he did cooperate, to make it as good for him as he could. Both the promise and the threat had the effect plainly intended by Martin. As for the promise, defendant initiated the second interview, in part, " 'cause I felt like [Martin]'d be able to help me." And as the second interview opened, Martin responded, "[t]hat's no problem" and "that's on tape," to defendant's statement, "you gotta tell them that I helped you out, so that they help me out when I go to court." As for the threat, defendant apparently believed that he was moving closer to home by initiating the second interview and obtaining Martin's promise that he would "send a letter to your mom." In initiating the second interview, defendant was "thinking I wanted to see my mom and brother again one of these days."

To be sure, there is one circumstance that, unlike the rest, weighs in favor of the voluntariness of defendant's initiation of the second interview, and in favor of the voluntariness of his two subsequent confessions as well—the apparent pressure that defendant's guilty conscience exerted upon him. Defendant himself admitted that he was "feel[ing] guilty," and that guilt "was weighing pretty heavy on [his] mind." The evidence, however, does not suggest that defendant's sense of guilt alone caused him to initiate the second interview or to make his subsequent confessions, but instead indicates that Martin's misconduct played the dominant role, with defendant making clear his concern that Martin assist both in communicating with defendant's mother and in dealing with the court.

In light of the record in its entirety, including all of the surrounding circumstances, we conclude that defendant's initiation of the second interview was involuntary, and that his two subsequent confessions were involuntary as well. Therefore, defendant's confessions were inadmissible not only in the People's case-in-chief because they were obtained in violation of *Edwards*, but also were inadmissible for *any* purpose because they were involuntary. Thus it follows that the trial court erred in denying defendant's motion to suppress the confessions.

B

Having concluded that the trial court erred by denying defendant's motion to suppress his two confessions, we now must determine whether the error requires reversal. As we shall explain, we conclude that it does.

---

[6] At oral argument, counsel for the People implied that defendant likely did not know the location of Timbuktu inasmuch as his education was minimal and his intelligence was quite low. We agree that defendant probably was unaware that Timbuktu is the "name of a town . . . on the edge of the Sahara in West Africa," but we have no reason to doubt, as Martin himself evidently believed, that defendant recognized that Timbuktu is "used as the type of the most distant place imaginable." (18 Oxford English Dict. (2d ed. 1989) p. 200.)

At the outset, we observe that the erroneous denial of defendant's motion to suppress his two confessions is subject to harmless error analysis under the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*). The *Chapman* test is generally applicable to error under the United States Constitution, including, specifically, the erroneous admission of involuntary statements (*Arizona v. Fulminante* (1991) 499 U.S. 279, 310 [113 L.Ed.2d 302, 111 S.Ct. 1246]), which here includes defendant's confessions.

The beyond-a-reasonable-doubt standard of *Chapman* "requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman, supra,* 386 U.S. at p. 24.) "To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates v. Evatt* (1991) 500 U.S. 391, 403 [114 L.Ed.2d 432, 111 S.Ct. 1884].) Thus, the focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is "whether the . . . verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 [124 L.Ed.2d 182, 113 S.Ct. 2078].)

In *Chapman,* the court stated that "error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot . . . be conceived of as harmless." (*Chapman, supra,* 386 U.S. at p. 24.) Even if, as a general matter, *Chapman*'s statement might appear overly broad, in the specific context of a confession it carries its greatest force. Indeed, in *People v. Cahill, supra,* 5 Cal.4th 478, we expressed a "recognition that confessions, 'as a class,' '[a]lmost invariably' will provide persuasive evidence of a defendant's guilt [citation], . . . that such confessions often operate 'as a kind of evidentiary bombshell which shatters the defense' [citation], . . . [and therefore] that the improper admission of a confession is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial . . . ." (*Id.* at p. 503.) We acknowledged, however, that the erroneous admission of any given confession "might be found harmless, for example, (1) when the defendant was apprehended by the police in the course of committing the crime, (2) when there are numerous, disinterested reliable eyewitnesses to the crime whose testimony is confirmed by a wealth of uncontroverted physical evidence, or (3) in a case in which the prosecution introduced, in addition to the confession, a videotape of the commission of the crime . . . ." (*Id.* at p. 505.) But we emphasized that although the erroneous admission of a confession might be harmless in a particular case, it nevertheless is "likely to be prejudicial in many cases." (*Id.* at p. 503.)

With the foregoing principles in mind, we simply cannot conclude that the People have proved that the erroneous admission of defendant's two confessions was harmless beyond a reasonable doubt. Without the confessions, defendant would not have been impelled to testify. He also would have had a substantial reason, and a strong incentive, to challenge the testimony of the questioned-documents expert, who opined that the note in which Adkins purportedly admitted his guilt actually was written by defendant. We do not ignore the other evidence, which distinctly points to the murderer as a person acquainted with Collins. But that very evidence allowed an inference that Collins's murderer might have been Adkins, whose relationship with Collins had been stormy. We do not deny that even without the confessions, the other evidence was sufficient to support the jury's verdict. ■ But at the same time we must acknowledge that the confessions, with their detail and general consistency with each other and with extrinsic facts, functioned as the veritable "centerpiece of the prosecution's case in support of . . . conviction." (*People v. Cahill, supra*, 5 Cal.4th at p. 505.) Certainly, defendant was not "apprehended by the police in the course of committing the crime"; neither were there "numerous"—or indeed *any*—"disinterested reliable eyewitnesses to the crime whose testimony [was] confirmed by a wealth of uncontroverted physical evidence." (*Ibid.*) As a result, we cannot say that the confessions were "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates v. Evatt, supra*, 500 U.S. at p. 403.) Nor can we say that the "verdict actually rendered in *this* trial was surely unattributable" to the confessions. (*Sullivan v. Louisiana, supra*, 508 U.S. at p. 279.)

In view of the foregoing, we cannot conclude that the erroneous admission of the defendant's two confessions was harmless beyond a reasonable doubt.

Lastly, we note that at any retrial, neither of defendant's two confessions will be admissible. Because each was involuntary, each is inadmissible for any purpose.

### III

For the reasons stated above, we reverse the judgment of the Court of Appeal.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Brown, J., Moreno, J., concurred.

**KENNARD, J.,** Concurring.— According to the majority, the trial court should have suppressed defendant Kenneth Ray Neal's confessions to the murder of Don Collins for two closely related reasons: (1) the confessions themselves were involuntary (see *Malloy v. Hogan* (1964) 378 U.S. 1 [12 L.Ed.2d 653, 84 S.Ct. 1489]); and (2) the confessions were obtained in violation of *Edwards v. Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880] (*Edwards*) because defendant did not voluntarily initiate the conversations at which he confessed. I agree. I write separately to note that the confessions also appear to be inadmissible for another and, in my view, more compelling reason, namely, the lack of a knowing and intelligent waiver of the right to counsel before the confessions. That was a point addressed in *Edwards*, but one that the majority here does not discuss.

In *Edwards*, the police took the defendant into custody and advised him of his *Miranda* rights. (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].) When he said he wanted to speak to an attorney, the police stopped questioning him. The next day, two other officers readvised him of his rights. This time the defendant agreed to talk, and he confessed to robbery and murder. The trial court admitted the confession, and the defendant was convicted of those crimes; the Arizona Supreme Court affirmed the judgment. The United States Supreme Court, however, reversed the Arizona Supreme Court's decision for two reasons. The majority here discusses the *second* reason, which is this: Once a suspect in custody invokes the right to counsel, the suspect "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Edwards, supra,* 451 U.S. at pp. 484–485.) Just as pertinent here, however, is the *first* reason the high court gave for reversing the Arizona Supreme Court's decision: the failure of that court and the trial court to consider whether the defendant had knowingly and intelligently waived the right to counsel.

In *Edwards,* the United States Supreme Court faulted the trial court for finding the defendant's "admission to have been 'voluntary,' . . . without *separately* focusing on whether [the defendant] had knowingly and intelligently relinquished his right to counsel." (*Edwards, supra,* 451 U.S. at p. 483, italics added.) The court stressed that "waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege . . . ." (*Id.* at p. 482.) The high court was just as critical of the Arizona Supreme Court for looking only to the voluntariness of the admission, without also considering whether the defendant "understood his right to counsel and intelligently and knowingly relinquished it." (*Id.* at p. 484.)

Here, too, the Court of Appeal looked only to the voluntariness of defendant's confessions, without *separately* considering whether he knowingly and intelligently waived his right to counsel.[1] The court may have been led astray by the parties' briefs. Defendant's brief merged the issues together, arguing that he "made his incriminating statements involuntarily, and that his waiver of his *Miranda* rights was not knowing, intelligent, or voluntary." The Attorney General's brief argued that the confessions were voluntary, but it never considered the issue of whether defendant knowingly and intelligently waived his right to counsel. As the high court stressed in *Edwards, supra,* 451 U.S. 477, those two questions are analytically different and must be separately addressed. (See also *Moran v. Burbine* (1986) 475 U.S. 412, 421 [89 L.Ed.2d 410, 106 S.Ct. 1135].)

Here, the argument that defendant did not knowingly and intelligently waive the right to counsel is far stronger than it was in *Edwards, supra,* 451 U.S. 477. Defendant made *nine* attempts to invoke his right to counsel. Each time, the interrogating officer ignored the request. By doing so, the officer unmistakably implied that defendant, an 18-year-old high school dropout with little experience of the criminal justice system, had no right to counsel that the officer was bound to respect. A right that is not honored when invoked is no right at all. Under these circumstances, defendant's later waiver of the right to the assistance of counsel during interrogation was "an empty ceremony" (*Collazo v. Estelle* (9th Cir. 1991) 940 F.2d 411, 423 (in bank)), and was not knowing and intelligent.

**BAXTER, J.,** Concurring.—There are few less pleasant judicial duties than to reverse a conviction because a police officer, though charged with enforcing the law, obtained important evidence by deliberately improper means. Yet I must join the majority in condemning the tactics used by Detective Mario Martin of the Tulare County Sheriff's Department.

In superficial deference to *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*), Martin told defendant, a suspect in custody, that he had the "right" to the presence and assistance of counsel before any questioning. But then, contrary to *Miranda*, Martin ignored defendant's repeated efforts to invoke that "right." Martin badgered defendant, made coercive threats and promises, and finally relegated defendant to overnight confinement with no food, water, or toilet access. These ploys had their intended effect. Placed in this situation, defendant—18 years old, unsophisticated, and ill-versed in the criminal justice system—could easily

---

[1] At trial defendant focused almost entirely on the question of voluntariness. Because I agree with the majority that the confession was involuntary, I do not address whether defendant adequately preserved for appeal the question whether he knowingly and intelligently waived his right to counsel.

assume that his right to counsel was illusory, that he would receive no legal help, and that he had no choice but to cooperate. It is no surprise that the next morning, chastened by his experience, defendant sought a renewed meeting with his interrogator and twice confessed.

I therefore concur in the majority's conclusion that both defendant's reinitiation of contact with Martin, and his subsequent confessions, were involuntary. Hence, as the majority hold, the confessions cannot be used against defendant for any purpose. Their use here was prejudicial, and defendant's conviction must therefore be reversed.

Perhaps the most disturbing aspect of this fiasco is Martin's admission that he was *taught on the job* to disregard *Miranda* in order to obtain statements for use as evidence in criminal cases against the declarants. Martin testified he knew he was supposed to stop questioning a custodial suspect who asked for a lawyer, but he ignored this prong of *Miranda* in hopes of eliciting evidence that could be used to impeach defendant if he testified in his own behalf in a criminal trial. According to Martin, he received training from a Sergeant Lomeli, who informed Martin that this tactic "can be a useful tool."

As Martin knew, statements obtained in violation of *Miranda*'s standards are excluded from the prosecution's case-in-chief, but if not otherwise involuntary, they may be used to impeach the suspect's trial testimony. (*Harris v. New York* (1971) 401 U.S. 222, 225–226 [28 L.Ed.2d 1, 91 S.Ct. 643] (*Harris*).) Moreover, we have held that use for impeachment is not obviated simply because the interrogating officer's failure to honor *Miranda* was deliberate. (*People v. Peevy* (1998) 17 Cal.4th 1184, 1191–1205 [73 Cal.Rptr.2d 865, 953 P.2d 1212] (*Peevy*).)

In *Peevy*, we expressly declined to consider whether a different result might apply to statements obtained "pursuant to . . . a systematic policy of police misconduct." (*Peevy*, *supra*, 17 Cal.4th 1184, 1205.) But nothing in *Peevy* was meant to condone deliberately improper interrogation tactics, whether individual or systematic.

As we explained in *Peevy*, the courts' refusal to extend the exclusionary sanction of *Miranda* to impeachment evidence is not founded upon any notion that it is legitimate for the police to interrogate a suspect in custody despite his demand for counsel. Rather, the United States Supreme Court has simply concluded that if the statements thereby elicited were voluntary, the cost of excluding them from evidence is too great where the result is to leave the defendant free to perjure himself at trial. (*Peevy*, *supra*, 17 Cal.4th 1184, 1204–1205; see *Harris*, *supra*, 401 U.S. 222, 224.)

California courts have time and again noted and decried deliberate police use of tactics that violate *Miranda* standards. (*Peevy*, *supra*, 17 Cal.4th 1184,

1204, citing, inter alia, *People v. Bradford* (1997) 14 Cal.4th 1005, 1042 [60 Cal.Rptr.2d 225, 929 P.2d 544] [police officers' "conduct in deliberately interrogating defendant after [he] had invoked his right to counsel was unethical and it is strongly disapproved"]; *In re Gilbert E.* (1995) 32 Cal.App.4th 1598, 1602 [38 Cal.Rptr.2d 866] [deploring deliberate *Miranda* violation and observing that "[w]hen the police deliberately step over the line and disobey Supreme Court pronouncements, respect for the . . . law necessarily diminishes"]; *People v. Bey* (1993) 21 Cal.App.4th 1623, 1627 [27 Cal.Rptr.2d 28] [expressing grave concern at deliberate *Miranda* violation, and observing that such police misconduct appears not to be a new tactic]; and *People v. Baker* (1990) 220 Cal.App.3d 574, 579 [269 Cal.Rptr. 475] [also deploring intentional *Miranda* violation and noting "the trial court here was well aware of the unlawfulness of the police conduct and stated that it intended to initiate steps to prohibit the San Diego Police Department from using such procedures in the future"].) It could not be clearer that efforts to gather court evidence by such means are improper.

Given this history, it is unconscionable for police departments or supervisors to give contrary instruction or encouragement to the officers under their jurisdiction. Law enforcement agencies have the responsibility to educate and train officers carefully to avoid improper tactics when conducting custodial interrogations. Officers must be made aware that they have an absolute obligation to play by the rules when questioning suspects in custody, and that their deliberate failure to do so will be severely disciplined. There can be no suggestion—formal or informal, direct or indirect—that improper interrogation tactics are required, encouraged, approved, condoned, or tolerated. Exactly the opposite impression must be conveyed to each and every officer. Only in this way can the police perform the crucial responsibilities they carry.[1]

In a free society, we place the police in a position of unique power, but only on condition that they will do their best to uphold the law, and to enforce it nobly and fairly. Their ability to function effectively depends upon their credibility in that role. The community must trust that they do not operate by deliberately violating the very standards they are sworn to observe. When the police dishonor proper procedures, community respect for the police, and for the law itself, is undermined. (See *In re Gilbert E.*, *supra*, 32 Cal.App.4th 1598, 1602.)

---

[1] Of course, *Miranda* standards do not apply to all police questioning of suspects in custody. A long recognized exception is questioning reasonably prompted by immediate concern for the safety of the officer or another person. (See *New York v. Quarles* (1984) 467 U.S. 649, 655–656 [81 L.Ed.2d 550, 104 S.Ct. 2626].) No such issue is presented here. Martin's testimony left no doubt he had been trained to disregard *Miranda* for purely evidentiary purposes.

Police officers are human beings, charged with the important, difficult, and "often competitive enterprise of ferreting out crime." (*Johnson v. United States* (1948) 333 U.S. 10, 14 [92 L.Ed. 436, 68 S.Ct. 367].) Individual mistakes and overreaching will occur despite the best efforts of departments, supervisors, and officers acting in good faith. But our community should never be subjected to cynical efforts by police agencies, or the supervisors they employ, to exploit perceived legal loopholes by encouraging deliberately improper interrogation tactics. Such practices tarnish the badge most officers respect and honor.

These concerns reinforce my agreement with the reasoning and result set forth by the majority today.

Chin, J., and Moreno, J., concurred.