Filed 1/14/15  P. v. Goodman CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>KINDU ALI GOODMAN,<br><br>      Defendant and Appellant. | D063787<br><br><br> (Super. Ct. No. SCD225298)<br><br>ORDER DENYING PETITION FOR REHEARING AND MODIFYING OPINION<br><br>**THERE IS NO CHANGE IN JUDGMENT** |

The court has read and considered the Respondent's petition for rehearing and has considered the Appellant's response to the petition.  In addition the court has considered the compact disk containing the recorded portion of the questioning of Appellant by Detective Conley.  The court remains satisfied that by any objective standard (*Stansbury v. California* (1994) 511 U.S. 318) Appellant was in custody within the meaning of *Miranda v. Arizona* (1966) 384 U.S. 436, when he was interrogated by police.

After review of the recording we agree with Respondent that the elapsed time of the recorded portion of the encounter was 33 minutes.  In light of the fact Appellant had

been involuntarily detained by police before the recording began, the change in elapsed time, under the totality of the circumstances does not change this court's opinion on the issue of custody.

The opinion is modified as follows:

On page 13, third full paragraph, the sentence "It was 44 minutes long." is modified to read "It was 33 minutes long."

On page 16, the second sentence "Conley questioned Goodman for 44 minutes and then directed him to wait until police officers searched and photographed him." is modified to read "Conley questioned Goodman for 33 minutes and then directed him to wait until police officers searched and photographed him."

The petition for rehearing is DENIED.

There is no change in judgment.

———————————————————
HUFFMAN, Acting P. J.

2

Filed 12/17/14 (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. KINDU ALI GOODMAN, Defendant and Appellant. | D063787 (Super. Ct. No. SCD225298) |


APPEAL from a judgment of the Superior Court of San Diego County, Louis R. Hanoian, Judge. Reversed.

Patrick Morgan Ford for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric Swenson and Barry Carlton, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Kindu Ali Goodman of first degree murder of Donald White. (Pen. Code, § 187, subd. (a).)[1] The jury also found true allegations Goodman used a firearm in committing the murder. (§§ 12022.5, subd. (a), 12022.53, subd. (b), 12022.53, subd. (c), 12022.53, subd. (d).) The trial court sentenced Goodman to consecutive terms of 25 years to life for murder, and 25 years to life for the discharge of a firearm causing the death of a person (§ 12022.53, subd. (d)), and stayed sentencing on the other firearm enhancements.

On appeal, Goodman contends the trial court prejudicially erred by admitting in evidence a statement he made to a San Diego Police Department (SDPD) detective during a custodial interrogation in violation of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436; instructing the jury it could infer consciousness of guilt from Goodman's false statements to the detective and/or his act of fleeing from the crime scene; and allowing the prosecution to present gang evidence, including expert opinion that Goodman was a member of a criminal street gang.

We agree with Goodman that his detention by police officers was custodial in nature and his statement was obtained in violation of *Miranda*. There is not substantial evidence to support the trial court's finding that the detective advised Goodman he was free to leave the scene of the interrogation and that Goodman's freedom of movement was not restricted. On independent review, we conclude that under the circumstances, a reasonable person in Goodman's position would not have believed that he or she was free

_____

1       Unless otherwise specified, statutory references are to the Penal Code.

2

to leave.  We further conclude that the error in admitting Goodman's statement was prejudicial and requires reversal.

In view of our conclusion, we need not consider the other issues Goodman raises on appeal, and tailor our recitation of the factual and procedural history of the case accordingly.

FACTUAL AND PROCEDURAL HISTORY

On March 17, 2008, Goodman attended a party at the Bahia Resort Hotel (Bahia) in San Diego.  Goodman's girlfriend, Jimeshia Coleman and several of her friends, including Porsche Wingate, had arranged the party in honor of Lincoln Park Day, which was celebrated on St. Patrick's Day by members and associates of a criminal street gang known as the Lincoln Park Street Gang.[2]  Coleman and her friends expected approximately 10 people to attend the party.  Instead, approximately 40 people showed up.  Among those persons were the victim Donald White, his girlfriend, April Warren, his friend Willie Spain, and several others.

White was loud and aggressive.  He had been drinking and smoking marijuana all day.  He and Spain were eating and drinking without contributing to the expenses.  White was asked to identify himself.  He said he "represent[ed]" Lincoln Park gang member Jennaro Harvey.  When White announced his connection to Harvey, people at the party

---

[2]  Many of the people involved in this case had nicknames or gang monikers. Although both the given name and moniker are used interchangeably throughout the record to refer to the same person, for simplicity, we use the person's given name in this opinion, unless his name is not in the record.

3

became very quiet. Harvey was in prison for the murder of Devester Harris, who had been a close friend of several of the women who had planned the party and others.

Porsche Wingate told White if he did not leave, she would "green light"[3] him. White refused to leave. They argued. Wingate and Jimeshia Coleman then asked Goodman and Frank McNelty to remove White from the party. Goodman punched White, who proceeded to pummel Goodman in return. Other partygoers joined in to help Goodman. Coleman, who had rented the room, and several other women, broke up the fight and told everyone to leave. A group of people congregated in the parking lot.

Maria Campuzano, a security guard at the Bahia, had received reports of a party and was headed in that direction. She saw four persons, later identified as Goodman, White, April Warren, and another woman, standing outside. Campuzano said Goodman, who was wearing a striped polo shirt, was apologizing to White, who was wearing a green T-shirt. Goodman was extending his hand to White, saying, "I'm sorry Blood." White was trying to fight Goodman. The women were saying to White, "Let's go, let's go."

As Campuzano walked past Goodman and White, her attention was drawn to a group of approximately 20 people who were arguing at the other end of the parking lot. The group started fighting.[4] Campuzano called SDPD for emergency assistance.

---

3     "Green light" means to beat up or kill.

4     This fight broke out after Porsche Wingate called Spain a "snitch" and he slapped her. Spain was jumped in the parking lot by approximately 10 people. He sustained a concussion and other injuries.

Goodman, White and the two women walked away, and Campuzano did not see them again. A few seconds into her call, Campuzano heard gunshots. The people in the crowd started running to their cars and leaving. The parking lot was in chaos.

Police arrived within minutes of the emergency call. White was pronounced dead at the scene. He had been shot three or four times. All the bullets entered White's body on the right side.

Homicide and gang detectives began to identify the people who had been at the party. They did not locate anyone who could, or would, identify the person who killed White.

On April 9, 2008, two police officers detained Goodman on the street where he lived for a vehicle infraction on his bicycle. They told him that a detective wanted to talk to him. Goodman was unhappy about having to wait. After approximately 15 minutes, Detective Paul Conley arrived and began to question Goodman. Conley surreptitiously recorded the interrogation. Conley advised Goodman several times he was not under arrest. When Goodman asked if he could leave, the detective said it was his prerogative and asked if Goodman wanted to leave from where he was or from the police station. Goodman repeatedly told Conley he wanted to leave.[5] Goodman eventually acknowledged he had been in a fight with White at the Bahia on St. Patrick's Day.

In September 2008, Ryan Wright was arrested on felony charges after escaping from a patrol car. Police officers discussed a variety of gang-related activities with

---

[5] We discuss Conley's advisements and Goodman's requests to leave the scene of the interrogation in greater detail in Discussion, part B.

Wright, including the murder of White. Wright said the shots that killed White were fired from the crowd. He saw the flash from a muzzle between Donny Love and another man. Wright said Love and "Lil' Black Dane" called the shot.

The homicide investigation stalled until January 6, 2010, when Frank McNelty was arrested on a probation violation. McNelty identified Goodman as the person who shot White. SDPD determined McNelty was at risk if he remained in the community and relocated him and his family in June 2010. They paid his moving expenses, bought furniture and basic household supplies for him, and covered his living expenses, which were approximately $2,000 a month. McNelty also received Social Security disability payments. He had a full scale IQ of 60.

The San Diego County District Attorney brought the case to a grand jury, which returned an indictment against Goodman in August 2010. The case went to trial on September 6, 2012, and concluded on October 1, 2012.

April Warren, the victim's girlfriend, testified that after the fight, Goodman appeared to be upset and would not accept White's apology. White was trying to shake his hand. She kept telling White to leave, saying "[l]et's go." White asked Warren to wait for him in her car and she left.

Jimeshia Coleman, Goodman's girlfriend, said White apologized to her after the fight. Goodman was present when White apologized. No one seemed upset. Goodman told her he was going home. There was no hostility and no attitude. Coleman bought the outfit Goodman was wearing that night. His shirt had fluorescent yellow and blue stripes

6

on a dark blue background. His jean shorts were fluorescent blue with fluorescent yellow.

McNelty testified he was trying to help Spain, who was being beat up by a group of people. He looked up and saw Goodman shoot White with a revolver. Goodman was approximately 40 feet away from McNelty. White was facing Goodman. They were approximately 13 to 14 feet apart. White was hit in the chest. After Goodman shot White, Goodman walked over to the group of people who were beating up Spain to tell them to stop. Goodman was wearing a white T-shirt under a pink shirt with pink and blue stripes.

After denying the defense's motion to suppress Conley's taped interrogation of Goodman, the tape was played for the jury.

Wright, who had told police officers that he saw a muzzle flash between Donnie Love and "Lil' Black Dane" at the Bahia on St. Patrick's Day, testified that he was not at the Bahia on St. Patrick's Day and did not tell police he saw a muzzle flash between Donnie Love and "Lil' Black Dane." Detectives who were present during Wright's interview in 2008 testified about Wright's prior statements.

Porsche Wingate and Donnie Love invoked their 5th Amendment rights against self-incrimination and did not testify.

Spain said after he was jumped, he walked towards Goodman, who was with Hassan Shareef El-Amin (Shareef). He heard gunshots and went to the ground. Spain thought they were shooting at him. Goodman was on the ground near him. Spain was under the influence of PCP (phencyclidine) at the time.

7

Shareef testified he was friends with both Goodman and White. Shareef was in the parking lot at the Bahia when he heard a commotion in the hotel room. When he turned to go into the room, White was coming out. He looked angry and upset. Goodman also came out. Shareef talked to Goodman and White, and they shook hands and hugged. White left to find his girlfriend. Shareef and Goodman walked the other way. They saw Spain walking toward them. They heard shots coming from the street next to the roller coaster and started running. Goodman was next to him.

A guest who was vacationing at the Bahia heard a woman pleading with someone to "just let it go" and "move on." This conversation lasted about five minutes. The guest looked out the window when he heard gunshots and saw two men, one wearing a dark shirt with stripes, sprinting away.

The prosecutor argued Goodman was motivated to kill White because he was angry at losing the fight. He emphasized that Goodman's evasive responses during his interview with Detective Conley showed that Goodman had a "[c]onsciousness of guilt." The defense said Goodman did not shoot White or commit any of the charged offenses. The jury returned guilty verdicts on all counts.

DISCUSSION

A

*The* Miranda *Issue*

Goodman contends he was in custody for *Miranda* purposes when he was interrogated by a homicide detective about his role in White's murder. He argues the court erred when it determined he was not in custody during the interrogation because he

was not handcuffed or restrained in a patrol car. Goodman asserts there is not substantial evidence to support the court's finding that Detective Conley told Goodman he could leave the scene of the interrogation. Goodman contends the record shows the police detained him against his will, separated him from his family, lied to him about evidence linking him to the Bahia, and either refused to respond or gave misleading answers when Goodman asked if he could leave.

The People maintain the court correctly determined Goodman was not in custody when he was questioned by Detective Conley. They argue Goodman's circumstances were akin to those of a customer dealing with a pushy salesman. Goodman was not being held at a police station and was repeatedly told he was free to go. Thus, his circumstances were not akin to a restraint on his movement to the degree associated with a formal arrest and his statements were not obtained in violation of *Miranda*.

B

*Additional Factual and Procedural Background*

Goodman filed a motion to exclude the statements he made in April 2008 to Detective Conley. He argued the statements were obtained in violation of his due process rights under the 5th and 14th Amendments to the United States Constitution, and in violation of *Miranda*.

The court found that Goodman had been interrogated by the police and granted a hearing to determine whether he was in custody at the time of the interrogation. The court reviewed the transcript of the interrogation.

9

Detective Conley testified that he interviewed Goodman for approximately 15 to 20 minutes on April 9, 2008. Goodman was stopped by two officers for a Vehicle Code violation on his bicycle. He was not given a ticket. It took Conley approximately 15 minutes to arrive after the officers notified him. He was with two other detectives. Conley said he advised Goodman numerous times he was not under arrest. Goodman was not identified as a suspect. He was not handcuffed. He was not placed in a patrol car. Conley testified he told Goodman he could leave. Conley acknowledged he did not allow Goodman's godmother to be present during the questioning. Another detective intercepted Jimeshia Coleman as she walked in their direction.

The transcript of the interrogation shows that when Conley arrived, a police officer told him that Goodman was not very happy and did not know why he was "being kept here." Conley directed Goodman to stand up. He told Goodman he was investigating the Bahia case, and asked Goodman if he knew what had happened there. Goodman said he read about it in the paper. Conley falsely told Goodman they had surveillance tapes from the Bahia. Conley advised Goodman he was not under arrest and asked him to voluntarily come to the police station to look at photos of people who may have been at the party.

Goodman said he was going home and gave the detective his address. Conley said, "[I]t's totally up to you, okay, like I said, we're not arresting you, you're not under arrest, okay? But I would rather handle my business downtown than on the street right here." Goodman said he was on his way to an event to commemorate his mother, who had passed away.

10

Conley said he was not arresting Goodman; he was asking him to come to the station voluntarily.  Goodman complained about being stopped and said he did not know what was going on.  Conley again asked Goodman to come to the station and talk about what happened at the Bahia.  Goodman asked, " . . . what, do I come there on my own?"

Conley said, "Well, we would, we would drive you down there.  I mean, we're not going to let you bike down there."

Goodman asked if he was under arrest.  Conley said, "No, you're not under arrest."

Goodman asked, "So do you mind if I leave?"

Conley replied,  "Well, . . . that's your prerogative.  A[h], you know, ah, you wanna leave from here or the station?"

Goodman said he wanted to leave from the current location and would come to the station with his godmother.  He wanted to go home and join the commemoration in honor of his mother.  Conley hesitated.  Goodman asked about the surveillance tapes.  Conley asked Goodman whether he was at the Bahia on St. Patrick's Day.  Goodman said if the police had him on the surveillance tape, then he was there.  Conley asked Goodman what he was doing on St. Patrick's Day.  Goodman acknowledged he was with his girlfriend at the Bahia.  When pressed for details, Goodman said Conley could look at the tape.  He again asked whether he was under arrest.  Conley said, "Right, you're not, okay?"

Conley told Goodman people were saying he was in a fight with the victim and asked Goodman if that were true.  Goodman said he did not know anything about the shooting.

11

Conley said, "You gotta understand, Kindu, we're, we're not arrestin' you, you're not under arrest, okay, but we're clearly, obviously you're stopped and we're talking to you because people are sayin' this." He asked Goodman another series of questions. Goodman said he wanted to go to his mother's commemoration. Conley said, "Well, that's why I want to go down to our station."

Goodman asked why he had to go to the station. Conley said it was more private and they could talk in greater detail. Goodman said he did not want to go to the station. He wanted to return home to honor his mother. Conley questioned Goodman about the fight. Goodman asked if there was a problem about him fighting. Conley said, "No, not at all. [¶] . . . [¶] If somebody said something to you and punched you first, I . . . fully expect that you hit 'em back."

Goodman acknowledged fighting with the victim but said he did not know anything about the shooting. Conley asked him to provide details about the fight. Goodman said he had been hit during the fight but did not know who had hit him. He asked, "So can I leave now?"

Conley told Goodman to wait "one second," saying he wanted to get his photo. Goodman sighed. Conley pressed Goodman for more details about the fight. Goodman responded to Conley's questions, adding, "Come on now, man. Man, I'm trying to go in the house, man."

Conley continued to ask Goodman more questions about the fight and the shooting. Goodman denied shooting a gun and said he did not gang bang.

12

Conley told Goodman that the officers would take his picture, and he would be right back. Goodman said, "Come on." The tape ended.

The trial court stated:

> "As to the entire conversation, the court specifically finds the defendant was not in custody of the police. He was not handcuffed. He was not in the back of a patrol car. He was not restrained in any way. He asked on numerous times whether he could leave, and in each instance, he was told he could leave.

> "At page 28 [referring to the transcript], where they said, 'We want to get a picture of you,' he could have left at that time as well. A reasonable person could have left at that particular time. He was not acquiescing to the authority of the police. That did not place him into custody at that time. The statement can come in in its entirety."

The recording of the interrogation was played for the jury. It was 44 minutes long.

In later trial testimony, Sharod Jackson, the grandfather of Goodman's son, testified he saw Goodman being harassed by police officers. When he walked up the street, the officers had Goodman up against the patrol car, questioning him. Jackson said, "It look[ed] like he could not go anywhere at the time."

C

*Legal Principles and Standard of Review*

When a person is subjected to a custodial interrogation, *Miranda* requires police to advise the person of "the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (*Miranda v. Arizona, supra,* 384 U.S. at pp. 444, 445; *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1160-1161 (*Aguilera*).) A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into

13

custody or otherwise deprived of his freedom of action in any significant way." (*Miranda*, at p. 444.)

When there has been no formal arrest, the custody issue turns on "how a reasonable person in the suspect's position would perceive his circumstances." (*Yarborough v. Alvarado* (2004) 541 U.S. 652, 662; *Berkemer v. McCarty* (1984) 468 U.S. 420, 442; *People v. Stansbury* (1995) 9 Cal.4th 824, 830.) Relevant factors include the length and location of the detention, the ratio of officers to suspects, and the demeanor of the officer, including the nature of the questioning. (*People v. Davidson* (2013) 221 Cal.App.4th 966, 972.) Additional relevant factors include whether contact with law enforcement was initiated by the police or by the person who was interrogated; whether the express purpose of the interview was to question the person as a witness or suspect; whether police informed the person that he or she was under arrest or in custody; whether police informed the person that he or she was free to terminate the interview and leave at any time; whether there were restrictions on the person's freedom of movement during the interview; and whether police used interrogation techniques to pressure the person. (*Aguilera, supra,* 51 Cal.App.4th at p. 1162.)

Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact. (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.) "When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must 'apply a deferential substantial evidence standard' [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, 'a reasonable

14

person in [the] defendant's position would have felt free to end the questioning and leave' [citation]." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.)

D

*Analysis*

There is not substantial evidence to support the trial court's finding Goodman was not in custody when he was interrogated by Detective Conley. The record shows that Goodman asked Detective Conley whether he was free to leave and repeatedly told him he wanted to go home. The record also shows that in no instance did Conley clearly advise Goodman he was free to leave the scene of the interrogation. When Goodman asked, "So do you mind if I leave?" Conley said that was his prerogative and immediately asked if Goodman wanted to "leave from here or the station." Conley told Goodman that he would not be allowed to ride his bicycle to the station; he would be transported in a police car. This conveyed the message that if Goodman did not speak to the detective at the scene, the police would take him to the police station to answer questions. Goodman repeatedly told Conley he wanted to leave, and Conley fostered the impression that he could not. Conley told Goodman he was not under arrest but "clearly, obviously you're stopped and we're talking to you . . . ." A reasonable person in Goodman's position would not have believed he or she was free to end the questioning and leave. (*Leonard*, *supra*, 40 Cal.4th at p. 1400.)

Other factors also support the conclusion the interrogation resulted in a significant deprivation of Goodman's freedom of movement for an extended period and was therefore custodial in nature. (*Aguilera, supra*, 51 Cal.App.4th at p. 1162.) The

15

detention was initiated by police officers. Goodman was detained in police custody for approximately an hour. Conley questioned Goodman for 44 minutes and then directed him to wait until police officers searched and photographed him. Although Goodman was not handcuffed or placed in the police car during the interrogation, he was in the presence of five police officers. A witness testified the officers had Goodman against the police car and it did not appear that Goodman was able to leave. Officers prevented family members who were present from contacting Goodman. The record shows that Goodman's freedom of movement was limited during the interrogation. (*Aguilera,* at p. 1162.)

This was not a temporary detention for brief questioning at the scene of a crime. (See *People v. Davidson, supra,* 221 Cal.App.4th at pp. 970-971 [*Miranda* warnings not required during "brief and casual" questioning during a temporary detention].) Instead, Conley used interrogation techniques to pressure Goodman, falsely telling him he had surveillance tapes showing him at the Bahia. (*Aguilera, supra,* 51 Cal.App.4th at p. 1162.) In his closing argument, the prosecutor acknowledged that Goodman was a suspect in White's murder at the time he was interrogated. The fact Conley surreptitiously recorded the interrogation also indicates Goodman was a suspect.

On independent review, we conclude that a reasonable person in Goodman's position would not have felt free to end the questioning and leave. (*Leonard*, *supra*, 40 Cal.4th at p. 1400.) Goodman's statements were obtained in violation of *Miranda* and are therefore inadmissible.

16

E

*The Error Is Not Harmless Beyond a Reasonable Doubt*

We review a *Miranda* violation to determine whether the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) "The beyond-a-reasonable-doubt standard of *Chapman* 'requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*People v. Neal* (2003) 31 Cal.4th 63, 86.) The People do not meet that standard here.

As the trial testimony shows (see Factual and Procedural Background, *ante*), the state's case depended primarily on the testimony of McNelty, who, as the trial court noted at sentencing, was a witness with "substantial baggage." The record shows that McNelty was an incentivized witness who did not identify Goodman as the shooter until he believed he would be sent to prison on a probation violation. McNelty's testimony that Goodman and White were standing face-to-face when White was hit was contrary to forensic evidence showing that the bullets entered the right side of White's body and exited to the left. Shareef testified Goodman was with him when the shooting occurred. McNelty's description of Goodman's shirt as pink with pink and blue stripes was at odds with other witnesses who testified Goodman was wearing a polo-type shirt with blue and yellow stripes on a dark blue background. As to the prosecution's theory for Goodman's motivation to shoot White, the testimony of the witnesses varied widely: Goodman was angry; Goodman was not angry; White was angry; White was not angry; Goodman was

17

trying to apologize to White; White was trying to apologize to Goodman; both Goodman and White were upset but, after talking, they shook hands and hugged.

The People do not show the evidence obtained in violation of *Miranda* did not contribute to the verdict. In his closing argument, the prosecutor relied on Goodman's statements to Conley, arguing at length that if Goodman had nothing to hide he would have answered the detective's questions truthfully and that his evasive answers demonstrated his consciousness of guilt. (*People v. Neal*, *supra*, 31 Cal.4th at p. 86 [error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot be viewed as harmless].) This is not a case in which there are "numerous, disinterested reliable eyewitnesses to the crime whose testimony is confirmed by a wealth of uncontroverted physical evidence." (*People v. Cahill* (1993) 5 Cal.4th 478, 505.) We conclude the error is not harmless beyond a reasonable doubt.

## DISPOSITION

The judgment is reversed.

HUFFMAN, Acting P. J.

WE CONCUR:

McDONALD, J.

AARON, J.

18