Filed 2/19/15  P. v. Riley CA4/1
Opinion following remand from U.S. Supreme Court

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D059840 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD226240) |
| DAVID LEON RILEY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Laura W. Halgren, Judge, after remand from the United States Supreme Court.  Judgment affirmed.

Patrick Morgan Ford for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant David Riley of numerous offenses and, on appeal from that conviction, this court rejected each of his claims of error and affirmed the judgment. (*People v. Riley* (Feb. 8, 2013) D059840) [nonpub. opn.] (*Riley I*).)  In rejecting one of Riley's claims of error, this court followed *People v. Diaz* (2011) 51 Cal.4th 84 and held the trial court did not err when it denied Riley's motion to suppress evidence obtained from a warrantless search of the contents of his cell phone seized when he was arrested. However, in *Riley v. California* (2014) 231 U.S. 1446, the United States Supreme Court held a warrant is generally required before searching a cell phone even when the cell phone is seized incident to arrest (*id*. at p. 2493), effectively overruling *Diaz* (see *People v. Buza* (Dec. 3, 2014, A125542) ___ Cal.App.4th ___ [2014 WL 6807723]), reversed the judgment in *Riley I* and remanded the case for further proceedings not inconsistent with its opinion.

Riley was convicted of one count of shooting at an occupied vehicle (Pen. Code, § 246, count 1), one count of attempted murder (*id.* at §§ 664/187, subd. (a), count 2) and one count of assault with a semi-automatic firearm (*id.* at § 245, subd. (b), count 3). Numerous enhancements appended to those counts were found true, including two firearm enhancements (under Pen. Code, § 12022.53, subds. (b) & (e)(1)) in connection with count 2, that he personally used a firearm (within the meaning of Pen. Code, § 12022.5, subd. (a)) in connection with count 3, and (as to each count) that he committed the offenses for the benefit of a criminal street gang within the meaning of Penal Code section 186.22, subdivision (b).

On remand, Riley asserts his convictions must be reversed in their entirety because, considering all of the evidence properly admitted at trial, the erroneous admission of three photographs taken from his cell phone cannot be deemed harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). The People argue that because the three photographs were cumulative of other properly admitted evidence, the erroneous admission of those photographs was harmless beyond a reasonable doubt.

The People also argue the photographs could properly have been admitted under the so-called "good faith" exception articulated in *Davis v. U.S.* (2011) ___ U.S. ___ [131 S.Ct. 2419], which held that "when the police conduct a search in compliance with binding precedent that is later overruled[,] . . . suppression would do nothing to deter police misconduct in these circumstances, and because it would come at a high cost to both the truth and the public safety, . . . searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." (*Id*. at pp. 2423-2424.) Riley responds that because there was no *binding* appellate precedent permitting cell phone searches incident to an arrest, but was instead merely a split of authority at the time of this search (see generally *U.S. v. Clark* (E.D.Tenn., 2014) 29 F.Supp.3d 1131, 1142-1143, discussing split of authority), the good faith exception does not apply. There is substantial uncertainty over whether *Davis's* "good faith" exception will apply to pre-*Riley* cell phone searches (see, e.g., *U.S. v. Garcia* (N.D.Cal., Sept. 12, 2014, No. 13–cr–00601–JST–1) ___ F.Supp.3d ___ [2014 WL 4543163] ["[o]bviously,

3

given how recently *Riley* was decided, few courts have had an opportunity to continue the interplay between *Riley* and *Davis*" but concluding *Davis* "preclud[es] the suppression of cellphone searches conducted before *Riley* was decided"]), but because we conclude the admission of the evidence was harmless, it is unnecessary to determine whether *Davis's* "good faith" exception applies to pre-*Riley* cell phone searches.

I

THE TRIAL EVIDENCE[1]

A. Prosecution Evidence

*The Gang Evidence*

The prosecution introduced evidence that Riley belonged to the Lincoln Park gang. The prosecution's gang expert, Detective Barnes, testified he was familiar with that gang. Among the symbols for the Lincoln Park gang is the letter "L," the numeral "5-0" or "50," and the color green. Barnes concluded Riley was a Lincoln Park gang member because Riley had been contacted on 12 different occasions in the presence of other Lincoln Park gang members, had been seen at least three different times wearing gang clothing (a green bandana), has a gang moniker of "Dave Bo," and was seen by Barnes in

---

[1]   We recite the pertinent trial evidence because "*Chapman* mandates consideration of the entire record prior to reversing a conviction for constitutional errors that may be harmless . . . ." (*U.S. v. Hasting* (1983) 461 U.S. 499, 509, fn. 7; see also *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681 ["an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt"].)

several photographs throwing gang signs with other known Lincoln Park gang members.[2]

Also, Riley's moniker of "Dave Bo" was lettered onto the headrest of the Oldsmobile registered to him. Riley also employed slang commonly associated with Lincoln Park gang members.[3] The expert also testified the photographs obtained from Riley's cell phone showed Riley throwing gang signs common to Lincoln Park gang members.

*The Shooting*

Around 2:30 p.m. on August 2, 2009, Riley's Oldsmobile was parked in front of the Urias family home near an intersection in the Skyline neighborhood of San Diego. Riley's girlfriend, Jazmin McKinnie (who lived down the street from the Uriases), was standing and talking with three men near Riley's car. (*Riley I, supra,* D059840, at p. 2.)

Mr. Webster (a member of a rival gang), drove his car through the intersection. The three men standing near Riley's car fired numerous gunshots at Webster's car. Webster's car crashed into something. The shooters got into Riley's Oldsmobile and drove away. Numerous shell casings from at least two different guns (a .40 caliber handgun and a .45 caliber handgun) were found at the scene. Police found Riley's Oldsmobile the next day in a Lincoln Park gang area. It was almost completely hidden under a car cover. The three eyewitnesses to the shooting declined to give a positive

---

[2] It appears these were photographs other than the three photographs seized from Riley's cell phone.

[3] During a jailhouse phone call recorded by police, Riley used the term "bool," a term used by gangs aligned with the Blood sect that means "cool" but, because the rival Crips gangs use the term "cool," Blood members replace the letter "c" with the letter "b" when employing that term.

5

identification of Riley as one of the shooters, although one of those witnesses said Riley could have been one of the shooters.  (*Riley I, supra,* D059840, at pp. 2-3.)

Two eyewitnesses told an officer that one of the men was a black male between 20 and 30 years old, with a height of 5'10" and a thin build weighing between 150 and 160 pounds, and the parties stipulated that on the day of the shooting Riley was 5'11" and 150 pounds.  However, one witness admitted she testified at a preliminary hearing that Riley was not the man she saw, but then at trial explained Riley could have been the man she saw.  The other eyewitness was unable to identify Riley when shown a photographic lineup shortly after the shooting.  A Mr. Haddock was identified as being involved based on a positive identification from an eyewitness, and another man belonging to Riley's gang (Mr. Haynes) was tied to the shooting by DNA evidence found on the gun used in the shooting.  (*Riley I, supra,* D059840, at p. 3, fn. 4.)

*The Stop and Search*

On August 22, 2009, Riley was driving his other car (a Lexus) when he was stopped by police.  A search of the car found a .40 caliber handgun and a .45 caliber handgun hidden in a sock inside the engine compartment.  Ballistics testing confirmed these two weapons were used in shooting at Webster's car.  DNA testing confirmed Riley and two other men were possible contributors for the samples taken from one of the handguns, and Haynes and two other men were possible contributors to the sample taken from the other handgun.  (*Riley I, supra,* D059840, at p. 3.)

Riley was arrested as a result of this stop and police seized his cell phone. Cell phone records showed Riley's phone was used near the place of the shooting at around the time of the shooting, and was used about 30 minutes later near the location where police found Riley's Oldsmobile hidden under the car cover. (*Riley I, supra,* D059840, at pp. 3-4.)

*Riley's Jailhouse Statements*

While in jail, Riley made several phone calls, recordings of which were played for the jury. In an August 24, 2009, telephone call, Riley asked the other person (an unidentified female) "what exactly did my charges say?" When she responded there were "gun charges," he asked, "But did it have--did it have any shooting stuff? It just had gun charges[,] right?"[4] When she told Riley it was limited to gun charges and driving without a license, he asked, "No type of shooting or any . . ." and she replied, "it had some other stuff. I don't know what it means though," and Riley stated, "it would say like attempted something or something like that." In another phone call two days later, he mentioned "like no way that that shit is, it's gonna come back to me like no matter what, the ballistics, it's gonna show . . . ." In another call that day, he told McKinnie his "main focus" was getting bailed out and "[t]he reason why I'm trying to get bailed out is because I know what they got and I know what's [going to] hit eventually." During that same call,

---

4    Shortly after Riley was arrested, he invoked his right to an attorney and told the detective he would not speak about the case, although Riley did want to talk about getting his car out of impound. At one point during the conversation, Riley stated " 'detective, you know I would have talked to you if I knew it was only about the guns.' "

7

after telling her he was "trying to hit third world countries . . . [bec]ause I'm trying to get, really," Riley stated, "I'm waiting for these . . . mother fuckin' whoopties[5] to come back . . . and it's a rap, so before then, I'm trying to be 5000, 50, 50 world states up out [of] this mother fucker though."  (*Riley I, supra,* D059840, at p. 4.)

B. Defense Evidence

The defense introduced testimony that a Mr. Redford looked similar to Riley, but the police never showed Redford's picture to the witnesses, even though Redford's DNA was on one of the guns seized by police.  Although Riley's DNA was found on one of the guns, his fingerprints were not found on any of the cartridges or on the clip.  The defense also showed Riley regularly loaned his Oldsmobile to other people.

II

ANALYSIS

A. Applicable Standard

When, as here, evidence is admitted that was the product of a Fourth Amendment violation, the proper test for whether the error was harmless is *Chapman*.  (*People v. Howard* (1987) 190 Cal.App.3d 41, 45.)  "The beyond-a-reasonable-doubt standard of *Chapman* 'requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Quoting *Chapman, supra*, 386 U.S. at p. 24.]  'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the

_____

5       McKinnie testified a "whooptiwopper" or "whooptiwham" is slang that can mean a gun. (*Riley I, supra,* D059840, at p. 4, fn. 6.)

8

jury considered on the issue in question, as revealed in the record.' [Quoting *Yates v. Evatt* (1991) 500 U.S. 391, 403, disapproved on other grounds in *Estelle v. McGuire* (1991) 502 U.S. 62, 73, fn. 4.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is 'whether the . . . verdict actually rendered in *this* trial was surely unattributable to the error.' [Quoting *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.]" (*People v. Neal* (2003) 31 Cal.4th 63, 86.) As the high court explained in *Yates*, at p. 403: "To say that an error did not 'contribute' to the ensuing verdict is not, of course, to say that the jury was totally unaware of that feature of the trial later held to have been erroneous. . . . [¶] To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record."

    B. <u>Analysis</u>

    The evidence here, although circumstantial, tied Riley to the shootings in numerous ways: he was the registered owner of the Oldsmobile observed near his girlfriend's house at the time of the shooting, and his girlfriend was talking to three men (one of whom was described by witnesses as consistent with Riley's description) who fired the shots at Webster. Moreover, although a defense witness stated Riley often loaned the car to other people, Riley's cell phone usage records showed his cell phone was *also* near the place of the shooting around the time of the shooting, and was further used about 30 minutes later near the location where police found Riley's Oldsmobile.

Additionally, while the *car* used in the shooting was apparently abandoned quickly after the shooting, the *guns* used in the shooting were not similarly abandoned, but were instead found hidden in another of Riley's cars three weeks later with Riley's DNA on one of them. Finally, Riley's jailhouse phone calls and statements shortly after he was arrested showed he was more concerned about being charged in connection with the shooting (with "attempted something") than being charged with "just . . . gun charges," and suggested he knew those guns would ultimately be linked by ballistics to the shooting.

There was also substantial evidence from a gang expert who testified the shooting was gang related (because the victim was a member of a rival gang to the Lincoln Park gang) and who further testified (based on sources of information *other* than the three tainted photographs introduced at trial) Riley was a Lincoln Park gang member. We must evaluate whether admission of the three photographs, which were largely duplicative of each other and merely showed Riley and another gang member throwing gang signs, was "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates v. Evatt, supra*, 500 U.S. at p. 403.) The fact the photographs showed Riley in front of the Oldsmobile was certainly unimportant based on the undisputed evidence that Riley owned the Oldsmobile. The fact the photographs showed Riley throwing gang signs was also unimportant because it merely provided visual verification of *one* of the bases for the expert's opinion about Riley's membership in the Lincoln Park gang (i.e. that Riley had been depicted in several

10

photographs throwing gang signs) and had no confirmatory value for any of the myriad other bases for the expert's opinion about Riley's membership in the Lincoln Park gang: Riley's numerous contacts in the company of other gang members, Riley's sporting of gang clothing, his adoption of a gang moniker and imprinting that moniker on his car's headrest, and Riley's use of gang-specific slang. The photographs (in addition to being duplicative of other photographs the expert had seen depicting the same behavior) were but a single string in the bow of the expert's opinion, and we therefore conclude the photographs were "unimportant in relation to everything else the jury considered on the issue" of Riley's gang membership, and were even less important "in relation to everything else the jury considered on the issue *in question*": whether Riley was one of the shooters.

Riley argues the erroneous admission of the photographs cannot be deemed harmless beyond a reasonable doubt because the prosecution relied on circumstantial evidence, and gang evidence is so inflammatory that its admission cannot be deemed unimportant in relation to everything else the jury considered on the issue in question. Certainly, the courts have acknowledged that gang evidence involves such "opprobrious implications" (*People v. Perez* (1981) 114 Cal.App.3d 470, 479) that it should be admitted with caution and should not be admitted when only tangentially relevant to the charged offenses (*People v. Cox* (1991) 53 Cal.3d 618, 660, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22) because it creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore

11

guilty of the charged offense. (*People v. Carter* (2003) 30 Cal.4th 1166, 1194.)
However, the issue is not whether the admission of gang *evidence* with its attendant
inflammatory consequences on the jury was harmless error (see, e.g., *Carter,* at p. 1194
[although gang membership creates risk of improper inference of criminal disposition and
"thus should be carefully scrutinized by trial courts . . . such evidence is admissible when
relevant to prove identity or motive"]), but is instead whether it was harmless error to
admit this specific *cumulative* evidence of gang conduct. We are confident the
photographs had such a de minimus incremental inflammatory impact that their
erroneous admission was unimportant in relation to everything else the jury considered
on the issue in question and therefore was harmless beyond a reasonable doubt.

DISPOSITION

The judgment is affirmed.

McDONALD, J.

WE CONCUR:

NARES, Acting P. J.

McINTYRE, J.