Filed 10/27/25  P. v. Curl CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROYCE DEAN CURL II,<br><br>    Defendant and Appellant. | H051444<br>(Monterey County<br> Super. Ct. No. 22CR004857) |

A jury convicted defendant Royce Dean Curl II of all four counts listed in the amended information:  possession for sale of fentanyl, a controlled substance (Health & Saf. Code, § 11351; count 1); possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1); count 2);[1] possession of ammunition by a felon (§ 30305, subd. (a)(1); count 3); and possession of a controlled substance with a firearm (Health & Saf. Code, § 11370.1, subd. (a); count 4).  The jury also found true an allegation that Curl sustained a prior strike conviction (§§ 667, subd. (d), 1170.12, subd. (b)) for violating section 246.3, subdivision (a), willful discharge of a firearm.

On appeal, Curl argues that the judgment should be reversed because certain of his statements to a sheriff's detective were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and thus should have been suppressed.  Curl also argues

---

[1] Unspecified statutory references are to the Penal Code.

that substantial evidence does not support the jury's finding that he sustained a prior strike conviction.

We conclude that any error in admitting Curl's statements to the detective is harmless beyond a reasonable doubt. As a result, we need not determine whether the trial court erred in admitting the statements. We further accept the Attorney General's concession that substantial evidence does not support the true finding on the prior strike allegation. Accordingly, we will reverse the judgment, allowing the People the opportunity to retry the prior strike allegation.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Monterey County Sheriff's Office officials searched Curl's residence, car, and person pursuant to a warrant. In the residence shared by Curl and his girlfriend, law enforcement found a loaded firearm, a bag containing about 460 "M30" pills, cash amounting to $5,250, and an additional amount of $50,000 in cash. Sheriff's officials testified that an M30 pill is stamped to appear to be oxycodone. However, tests revealed that the pills contained fentanyl. The search also discovered two scales containing heroin residue. A search of Curl's person found $2,515 in cash and an additional 296 M30 fentanyl pills.

### A. *Motion to Suppress Curl's Statements*

Curl moved in limine to suppress certain statements he made to a sheriff's detective, asserting that the detective violated *Miranda* by interrogating him after he invoked his right to counsel. The prosecution also moved to admit these statements, arguing that the detective did not ask questions of Curl after Curl invoked his right to counsel and that Curl voluntarily gave statements when he reinitiated conversation with the detective.

Detective Jesse Pinon testified for the prosecution at the motions hearing. He stated that in the course of executing the search warrant, two officers searched the vehicle described in the warrant and found narcotics. Curl was walking toward the vehicle; the

2

officers searched him and found narcotics on his person as well. Detective Pinon then searched the house and located narcotics, cash, and a gun. Detective Pinon testified that "[o]nce we conducted our search and our investigation at the residence and in the vehicle [Curl] was in possession of," he advised Curl of his *Miranda* rights using a standard rights advisement card. At that point, Curl had been handcuffed for 30 to 45 minutes during the search. Detective Pinon testified that after providing a rights advisement and after Curl stated he understood his rights, he asked Curl whether the drugs found in the residence belonged to Curl or Curl's girlfriend. Curl responded that "everything was his and that he would like a lawyer." Detective Pinon stopped questioning Curl.

Curl was placed under arrest and remained in handcuffs. Detective Pinon testified that the following then occurred: "I was standing near [Curl], and I was in the presence of him when he made some spontaneous statements." Asked to clarify what he meant, Detective Pinon testified: "He was just ranting, just making statements about what was going on." Detective Pinon testified that Curl's statements were not in response to any questions Detective Pinon asked. Detective Pinon testified that Curl's statements came "[w]ithin a minute" of his earlier invocation of the right to counsel.

Detective Pinon testified in the motions hearing that after Curl invoked his right to counsel, "Curl initially said that he had nothing to do with anything." At trial, Detective Pinon testified that Curl said his girlfriend (not Curl) "had nothing to do with anything." Regardless of the exact nature of Curl's statement after invoking his right to counsel, Detective Pinon then "made a statement that these pills that [Curl] had in possession were deadly and responsible for killing people." On cross-examination at the motions hearing, Curl's counsel asked Detective Pinon whether his statement about the pills being deadly and responsible for killing people was "directly in response" to Curl's comment that he had "nothing to do with anything." Detective Pinon responded: "No. I think that was just the pills that were present, the evidence that was taken from the vehicle. The detectives were still processing the vehicle that he was standing next to." Detective

Pinon also testified that the pills located on Curl's person were present at the scene, and Curl's counsel asked: "And so based on looking at those pills, did you make the statement to him that these pills are deadly and responsible for killing people?" Detective Pinon replied: "I think that was in general to even the ones I found inside the residence."

After Detective Pinon stated that the pills were deadly and responsible for killing people, "Curl said that his pills don't kill people and that he makes sure of that, and that he's basically almost a chemist. [¶] And, at that point, he said he did what he has to do and that people were out there trying to get him so he had to protect himself." Detective Pinon testified that he did not ask any questions or make any other statements as Curl made these statements.

The trial court orally denied the defense's motion to suppress the statements. The trial court's ruling stated: "The Court finds the testimony of Detective Pinon to be credible. There is . . . neither a Fifth nor Sixth Amendment violation." Other than finding Detective Pinon credible, the trial court made no findings of fact in its ruling.

## B. *Trial Proceedings*

At trial, Detective Pinon testified that he explained to Curl "why we were at the residence," and that he informed Curl about the search warrant. Curl asked "who had snitched on him." Detective Pinon testified that in response: "I informed [Curl] of what we had found, the gun and narcotics in the residence. I asked him if they were his. I -- first I asked if he understood his rights. He said yes. I asked him about the gun and narcotics found in the residence, if they were his or his girlfriend's. At that point, he said they're all his." After Curl invoked his right to counsel, Detective Pinon testified, Curl said his girlfriend "had nothing to do with anything." Detective Pinon testified that the following then occurred: "I informed him that the M30 pills are what's killing a lot of people and it's getting a lot of people sick. He said he made sure that his weren't doing that, had that kind of effect, and that he would oversee them when they were being

4

pressed or being made." Detective Pinon testified that Curl "also did mention that he's almost a chemist so he's aware of the breakdown."

The prosecutor asked Detective Pinon based on his training and experience whether there was "anything significant about what the defendant told you?" Detective Pinon replied as follows: "Yes. On top of him taking claim [*sic*] for everything, his statement that he made sure his pills weren't killing anybody basically kind of adds he is making sure his supply isn't bad and getting people sick. That he is a chemist. So he's actually saying he's basically doing research into his own -- his own product being made." Detective Pinon also testified that Curl made other statements about being in a "known drug area" and asked "why was he the only one arrested or . . . contacted." Detective Pinon testified: "He just mentioned that why was he selected if there's a bunch of drug dealers down there. I told him I didn't see anybody. I didn't see any other drug dealers down there at the time."

Detective Pinon and another sheriff's official testified as experts in fentanyl sales. Detective Pinon opined that Curl possessed the fentanyl pills for sale. He summarized the basis for his opinion as follows: "Based on the large amount of M30 pills and then the heroin that he has in his possession, the individually bagged M30 pills of denominations of 20. So those are ready to be sold in 20-pill increments. The currency, also having a scale, and a larger amount of M30 pills at his residence. [¶] Based on possessing all these items, I believe that he possessed these for sales. Also having the knowledge of knowing that his product isn't killing people, making those statements. A user is not going to say, hey, I'm possessing these things so I don't kill other people. His only purpose for possessing these things would be for personal use, not for the safety of other people." He further testified that the fact that Curl was found with one larger bag of fentanyl pills and smaller bags of pills supported his opinion, as "[a] user doesn't individually package their pills in 20-pill increments." A second sheriff's official opined that Curl possessed the pills for sale based on the number and packaging of pills found,

5

along with the cash and the denominations of bills found in Curl's possession. The second expert did not refer to Curl's statements as a basis for his opinion.

Curl testified on his own behalf at trial. He testified that the pills found in his home and on his person were for his own personal use, and that he planned to return some of the pills to the person who sold them to him because the pills did not produce the intended effect. Curl testified that he bought M30 pills in bulk for a better price and that he used up to eight pills at a time due to his high tolerance level. Curl testified that he owned the firearm for protection and that the firearm had "nothing to do with drug sales." On cross-examination, Curl explained his statements to Detective Pinon as follows: "I was just being sarcastic because I felt like they were just maximizing and searching and trying to put something on me to make a case that wasn't there." Curl's girlfriend also testified during the defense's case-in-chief. She testified that the $5,250 in cash belonged to Curl but that the amount of more than $50,000 in cash was hers, the result of savings from her paychecks over several years.

In rebuttal, Detective Pinon and the other expert both testified that using eight fentanyl pills at one time would be fatal.

The jury convicted Curl of four counts, including possession for sale of fentanyl (Health & Saf. Code, § 11351; count 1).[2] The jury also found true an allegation that Curl sustained a prior strike conviction (§§ 667, subd. (d), 1170.12, subd. (b)) for violating section 246.3, subdivision (a), willful discharge of a firearm. To prove this prior strike allegation, the prosecution submitted documentary evidence establishing that Curl was convicted in 2019 of violating section 246.3, subdivision (a), plus another offense. Curl also testified that he had been convicted in 2019 of "felony negligent discharge of a firearm" and another offense.

---

[2] Concerning count 1, the jury found not true an allegation that Curl was personally armed with a firearm in the commission of the offense (§ 12022, subd. (c)).

6

The trial court sentenced Curl to an aggregate term of nine years four months. This appeal timely followed.

## II. DISCUSSION

### A. *Admission of Curl's Statements*

Curl argues that the trial court erred in admitting statements he made to Detective Pinon because "the undisputed facts show that: (1) appellant was in custody when he unequivocally invoked his right to counsel; (2) appellant's rambling did not reflect a desire for further discussion; (3) Detective Pin[]on did not obtain a knowing and intelligent waiver of appellant's previously invoked right to counsel; and (4) Detective Pin[]on's accusation that the pills were 'deadly and responsible for killing people' was the functional equivalent of further interrogation." He further contends that the trial court's error in admitting the challenged statements was not harmless beyond a reasonable doubt because his statements were used to help prove that he possessed the fentanyl pills for sale.

The Attorney General asserts that the trial court properly admitted evidence of Curl's statements to the detective because Curl initiated further discussion after invoking his right to counsel and because the detective's statement about the nature of the pills was not the functional equivalent of interrogation. The Attorney General also contends that any error in admitting Curl's statements was harmless beyond a reasonable doubt.

#### 1. *Legal Principles and Standard of Review*

" 'The Fifth Amendment provides that no "person . . . shall be compelled in any criminal case to be a witness against himself." In *Miranda* [citation], the [United States Supreme] Court concluded that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." [Citation.] "Accordingly, the Court formulated the now-familiar 'procedural safeguards effective to secure the privilege

7

against self-incrimination.' " [Citations.]  Among these is the rule that when an accused has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." [Citation.]' [Citation.]" (*People v. Johnson* (2022) 12 Cal.5th 544, 577-578 (*Johnson*).)

The safeguards of *Miranda* apply to a suspect "only if he is subjected to custodial interrogation.  [Citation.]" (*People v. Cressy* (1996) 47 Cal.App.4th 981, 986.)  "Absent 'custodial interrogation,' *Miranda* simply does not come into play.  [Citations.]" (*People v. Mickey* (1991) 54 Cal.3d 612, 648.)  " ' "[I]nterrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " (*Johnson*, *supra*, 12 Cal.5th at p. 578.)

The erroneous denial of a confession suppression motion is subject to the beyond a reasonable doubt standard set forth in *Chapman v. California* (1967) 386 U.S. 18. (*People v. Neal* (2003) 31 Cal.4th 63, 86 (*Neal*).)  Thus, the prosecution is required to " 'prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained,' " meaning the error was " 'unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'  [Citation.]" (*Ibid.*)  Under this standard, " 'confessions, "as a class," "[a]lmost invariably" will provide persuasive evidence of a defendant's guilt [citation] . . . .' " (*Ibid.*)  " '[S]uch confessions often operate "as a kind of evidentiary bombshell which shatters the defense" [citation], . . . [and therefore] . . . the improper admission of a confession is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial . . . .'  [Citation.]" (*Ibid.*)  The California Supreme Court in *Neal* listed three examples of situations in which admission of a confession might be found harmless:  " '(1) when the defendant was apprehended by the police in

8

the course of committing the crime, (2) when there are numerous, disinterested reliable eyewitnesses to the crime whose testimony is confirmed by a wealth of uncontroverted physical evidence, or (3) in a case in which the prosecution introduced, in addition to the confession, a videotape of the commission of the crime . . . .' " (*Ibid.*)

"[T]he appropriate inquiry is 'not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.' [Citation.]" (*People v. Quartermain* (1997) 16 Cal.4th 600, 621 (*Quartermain*).) "While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision." (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296 (*Fulminante*).)

### 2. *Analysis*

We conclude that any error in admitting Curl's statements made after Detective Pinon's statements that the pills were deadly and responsible for killing people was harmless beyond a reasonable doubt. Therefore, we need not address whether Detective Pinon obtained these statements in violation of *Miranda*.

Curl's statements that "his pills don't kill people and that he makes sure of that, and that he's basically almost a chemist" did not amount to a "full confession" but rather "concern[ed] isolated aspects of the crime[s]" for which he was charged. (*Fulminante*, *supra*, 499 U.S. at p. 296.) These statements related only to one of the four counts Curl faced, possession for sale of fentanyl. With regard to this count, the prosecution introduced Curl's statements in relation to only one of the count's elements—that Curl intended to sell the fentanyl he possessed. The bulk of Curl's criminal activity, including his possession of large amounts of fentanyl pills and his possession of a firearm and ammunition, were proved by the evidence found in the search.

9

Additionally, the statements at issue were "incriminating only when linked to other evidence," evidence that by itself provided compelling proof that Curl possessed the fentanyl with intent to sell. (*Fulminante*, *supra*, 499 U.S. at p. 296.) Curl's statements in response to Detective Pinon did not directly admit that he possessed fentanyl with the intent to sell it. Instead, his statements indirectly supported an inference that Curl sold the pills to others because if he had possessed the pills for his personal use, he would not have said that he makes sure his pills do not kill others. The physical evidence found in the search more directly evinced Curl's intent to sell the pills. Law enforcement found numerous incriminating pieces of evidence in Curl's possession, including about 750 M30 pills with many of them in one large bag and others bagged in increments of 20. The jury could use its common sense and experience (CALCRIM No. 226) to conclude that Curl did not possess 750 or so fentanyl pills for his own personal use.[3] The search also revealed more than $50,000 and a firearm, among other items. Two prosecution experts testified that this physical evidence demonstrated Curl's intent to sell the pills. Detective Pinon recounted the physical evidence before concluding that "[b]ased on possessing all these items, I believe that he possessed these for sales." Only after stating his opinion based on the physical evidence did Detective

---

[3] In concluding that any error in admitting Curl's statements was harmless beyond a reasonable doubt, we do not consider the potentially incriminating impact of Curl's testimony that he possessed the pills for his personal use and that he used up to eight pills at a time, or the rebuttal testimony that using eight fentanyl pills at one time would be fatal. If Curl testified "in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible." (*Harrison v. United States* (1968) 392 U.S. 219, 223, fn. omitted.) We conclude that any assumed error was harmless beyond a reasonable doubt without reference to Curl's testimony or the prosecution's rebuttal evidence in response to Curl's testimony. Thus, we need not speculate whether Curl testified in response to the admission of his statements at issue. (See *People v. Henderson* (2020) 9 Cal.5th 1013, 1030, fn. 7 [discounting evidence of the defendant's testimony in a harmless error analysis where the defendant argued "his decision to testify flowed from the erroneous introduction of his pretrial statements"].)

Pinon refer to Curl's statements made in response to Detective Pinon. The other prosecution expert opined that Curl possessed the pills for sale based solely on the evidence found in the search. Curl's statements were therefore unimportant in relation to the physical evidence in this case.

Other factors support the conclusion that any error in admitting Curl's statements in response to Detective Pinon was harmless beyond a reasonable doubt. First, Curl's statements that he made sure his pills did not kill people and that he was almost a chemist were not the only incriminating statements he made. Before invoking his right to counsel, Curl admitted that everything found in the search was his. Then, after invoking his right to counsel but before Detective Pinon's statement, Curl said either that he or his girlfriend had "nothing to do with anything." Curl does not assert that these statements were improperly admitted. Curl's first statement admitted his ownership of all the physical evidence found in the search. With regard to the latter statement, if Curl said *he* had nothing to do with anything, then this contradicted his earlier statement that everything was his. If Curl said that *his girlfriend* had nothing to do with anything, then this amounted to an admission of some level of guilt on Curl's part. Either way, Curl's remarks made before the challenged statements provide further proof of his guilt.

Second, the prosecution did not highlight Curl's statements about making sure his pills do not kill people and being almost a chemist in its closing argument. The prosecution began its closing argument by highlighting the evidence found in the search, only later mentioning Curl's statements in response to Detective Pinon. Then, when discussing expert opinions that Curl possessed the pills for sale, the prosecutor discussed the physical evidence without referencing Curl's statements. Later, the prosecutor covered the elements of possession of fentanyl for sale. Concerning the element that Curl intended to sell the pills when he possessed them, the prosecutor stated: "First of all, the sheer amount of drugs is enough to be convinced that the defendant possessed these for sale." The prosecutor argued that "[t]he sheer amount of fentanyl pills is enough

11

evidence to prove that the defendant is guilty of selling fentanyl," before discussing the firearm, scales, and cash found in the search. Only after discussing this evidence did the prosecutor discuss Curl's statements in response to Detective Pinon. In total, the prosecutor's references to Curl's statements in response to Detective Pinon amounted to less than one page of a closing argument consisting of 15 transcribed pages.

In rebuttal, the prosecutor similarly argued that "the amount of fentanyl pills in this case is enough to convict the defendant alone," the prosecutor highlighted the other evidence found in the search, and the prosecutor's discussion of Curl's statements amounted to about one-half of a transcribed page in the six-page rebuttal argument. While the prosecutor did refer to the statements at issue in closing arguments, the prosecutor did not emphasize these statements and stressed that the jury should convict Curl based on the physical evidence alone. The prosecutor's arguments support the conclusion that other evidence such as the quantity of pills and their packaging was more probative of Curl's intent to sell the pills than any statement Curl made to Detective Pinon.

Detective Pinon testified as to the physical evidence found in the search, evidence that demonstrated on its own Curl's possession of fentanyl with intent to sell. Thus, any error in admitting Curl's statements was harmless beyond a reasonable doubt. Curl argues that his case does not neatly involve one of the three examples in *Neal* of situations in which admission of a confession might be found harmless. However, the examples in *Neal* are not exhaustive, and the instant case is similar to the first two examples *Neal* provided. Curl was apprehended in the course of possessing fentanyl with intent to sell it, and Detective Pinon and the other prosecution expert were " 'disinterested reliable' " witnesses " 'whose testimony is confirmed by a wealth of uncontroverted physical evidence . . . .' " (*Neal*, *supra*, 31 Cal.4th at p. 86.) The statements that Curl argues were obtained in violation of *Miranda* "concern isolated aspects of the crime or may be incriminating only when linked to other evidence" instead

12

of "a full confession in which the defendant discloses the motive for and means of the crime . . . ." (*Fulminante*, *supra*, 499 U.S. at p. 296.) Any assumed error did not contribute to the verdict and was harmless beyond a reasonable doubt. (*Neal*, *supra*, at p. 86; *Quartermain*, *supra*, 16 Cal.4th at p. 621.)

## B. *Prior Strike Offense*

Curl asserts that the prosecution failed to introduce substantial evidence that his conviction for violating section 246.3, subdivision (a) constituted a strike as defined by section 1192.7. The Attorney General concedes that the prior strike conviction was not proved by substantial evidence. The concession is well taken. We agree that substantial evidence does not support the jury's finding that Curl sustained a prior strike conviction.

Section 246.3, subdivision (a) states: "Except as otherwise authorized by law, any person who willfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a public offense and shall be punished by imprisonment in a county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170." Section 1192.7, subdivision (c) lists offenses that constitute a strike for purposes of sentencing under section 667. A violation of section 246.3 is not specifically enumerated as a strike offense in section 1192.7, subdivision (c). However, section 1192.7 states that a strike offense includes "any felony in which the defendant personally uses a firearm" (*id.*, subd. (c)(8)) or "any felony in which the defendant personally used a dangerous or deadly weapon" (*id.*, subd. (c)(23)).

At trial, the prosecution introduced documentary evidence that Curl was convicted in 2019 of violating section 246.3, subdivision (a) along with another offense, and Curl admitted the convictions. The evidence did not prove whether Curl violated section 246.3, subdivision (a) by personally using a firearm, or instead if Curl's guilt was based on his vicarious liability as an aider and abettor. "Section 246.3 can be used as a strike only if the defendant personally used the firearm. [Citations.]" (*People v. Golde* (2008) 163 Cal.App.4th 101, 111-112.) "It is possible to be convicted of grossly

negligent discharge of a firearm under section 246.3 without personally using a firearm, e.g., as an aider and abettor." (*Id.* at p. 112.)

"On an appellate challenge to a finding that a prior conviction was a strike, where the prior conviction is for an offense that can be committed in multiple ways, one or more of which would not qualify it as a strike, and *if it cannot be determined from the record that the offense was committed in a way that would make it a strike,* a reviewing court must presume the offense was not a strike." (*People v. Watts* (2005) 131 Cal.App.4th 589, 596.) Here, the prosecution's evidence did not demonstrate that Curl personally used a firearm, which was necessary to qualify his prior section 246.3, subdivision (a) conviction as a strike. Thus, the jury's true finding on the prior strike allegation is not supported by substantial evidence. We therefore will vacate the finding, reverse the judgment, and remand the matter for retrial of the prior strike allegation at the People's election. (See *People v. Barragan* (2004) 32 Cal.4th 236, 239 [retrial of a prior strike allegation is permissible where the reviewing court reverses a true finding for insufficient evidence].)

### III. DISPOSITION

The jury's true finding on the prior strike enhancement (Pen. Code, §§ 667, subd. (d), 1170.12, subd. (b)) is vacated and the judgment is reversed. The matter is remanded to the Superior Court of Monterey County. Upon issuance of the remittitur, the clerk of this court shall remit a certified copy of this opinion to the superior court for filing, and respondent shall serve another copy thereof on the prosecuting attorney in conformity with Penal Code section 1382, subdivision (a)(2). If the People do not elect to retry Curl on the prior strike allegation within 60 days after service pursuant to Penal Code section 1382, subdivision (a)(2), the trial court shall enter a judgment reflecting convictions for counts 1 through 4 and shall resentence Curl accordingly under current law. (See Pen. Code, § 1260.)

14

_____

Greenwood, P. J.

WE CONCUR:

_____

Grover, J.

_____

Lie, J.

People v. Curl
H051444